IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| John R. Wood, | ) | C/A No. 0:12-cv-3532-DCN-PJG |
| | ) | |
| Petitioner, | ) | |
| | ) | **ORDER AND** |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Bryan P. Stirling, *Commissioner, South* | ) | **(Death Penalty Case)** |
| *Carolina Department of Corrections*, Willie D. | ) | |
| Davis, *Warden, Kirkland Reception and* | ) | |
| *Evaluation Center*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Petitioner John R. Wood, a death-sentenced state prisoner, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter comes before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on Respondents' Motion for Summary Judgment and Return and Memorandum in Support thereof (collectively, the "Return"). (ECF Nos. 136 & 137.) Wood has filed a Traverse and Memorandum of Law in Opposition to Summary Judgment ("Traverse"). (ECF No. 150.) And, Respondents have filed a Reply to Petitioner's Traverse and Memorandum of Law in Opposition to Summary Judgment ("Reply"). (ECF No. 154.) Accordingly, Respondents' motion has been fully briefed and is ready for resolution. In addition, Wood has moved for an evidentiary hearing and to expand the record (ECF No. 151), and the parties have briefed that motion (ECF Nos. 153, 160). Having carefully considered the parties' submissions and the record in this case, the court concludes that Respondents' motion for summary judgment should be granted. Additionally, the court grants in part and denies in part Wood's motion regarding further factual development (ECF No. 151).

# BACKGROUND

The following facts are recited verbatim from the South Carolina Supreme Court's opinion

in Wood's direct appeal:

> Trooper Eric Nicholson, while patrolling I-85 in the Greenville area, called to inform the dispatcher that he was going to stop a moped. After Nicholson activated his lights and siren, [Wood], who was riding the moped, did not immediately stop. Two other troopers subsequently heard Nicholson scream on the radio and they rushed to the scene whereupon they found Nicholson had been shot five times. The driver's side window of Nicholson's car was completely shattered. Both of his pistols were secured in their holsters. Eight shell casings were found at the scene.

> There were several eyewitnesses to Nicholson's murder. Witnesses recalled seeing a moped being followed by a trooper with activated lights and sirens. The moped took the off-ramp to leave I-85 and then took a right down a frontage road. As the two vehicles got on the frontage road, the trooper sped up to get beside the moped and then veered to the left to stop at an angle against a raised median in order to block the moped's progress. The moped came to a stop close to the driver's side window.

> Immediately upon stopping, [Wood] stood up over the moped and raised his arm towards the driver's side window of Trooper Nicholson's car. Some witnesses saw a weapon in [Wood's] hand and heard gunshots. After firing several shots in the driver's side window of Nicholson's car, appellant backed the moped up, turned it around, and fled at a high rate of speed.

> After the shooting, some concerned citizens (The Wheelers) chased [Wood]. [Wood] entered a parking lot and then jumped into the passenger's seat of a Jeep, driven by a woman. The Wheelers subsequently called in the tag number to police.

> Once law enforcement officers began chasing the Jeep, [Wood] opened fire on the pursuing officers. One officer was struck in the face by a bullet fragment. He survived the injury. After subsequently hijacking a truck, [Wood] was eventually stopped and taken into custody.

State v. Wood, 607 S.E.2d 57, 58 (S.C. 2004).[1]

---

[1] While Wood challenges the South Carolina Supreme Court's decision on one direct appeal issue in this action, he does not challenge the court's factual recitation.



# PROCEDURAL HISTORY

*Trial and Sentencing*

Wood was indicted in May 2001 in Greenville County for Trooper Nicholson's murder and possession of a weapon during the commission of a violent crime (Greenville County Case No. 01-GS-23-3106).[2]  (App. at 3727, ECF No. 45-3 at 74.)  At trial, Wood was represented by attorneys John I. Mauldin, James Bannister, and Rodney Richey.  On February 11, 2002, a jury found Wood guilty of both charges.  (App. at 1780, ECF No. 42-7 at 20.)  Following a sentencing proceeding, the jury recommended a sentence of death on the murder charge, finding the aggravating factor of murdering a state law enforcement officer during the performance of his official duties.  (App. at 2254–2256, ECF No. 43-3 at 25–27.)  On February 16, 2002, the circuit court sentenced Wood to death.  (App. at 2259, ECF No. 43-3 at 30.)

*Direct Appeal*

On appeal, Wood, through counsel, Robert M. Dudek, raised four issues, including:

Whether the judge erred by ruling South Carolina's death penalty statute was constitutional where it mandated that appellant, seeking the mitigating evidence attendant to pleading guilty, and accepting responsibility, must waive jury sentencing, since this procedure denied appellant his right to present mitigating evidence to a sentencing jury?

---

[2] Wood and his girlfriend, Karen McCall, were also indicted in Anderson County on charges stemming from the high-speed chase they initiated after the murder of Trooper Nicholson. See State v. Wood, 608 S.E.2d 435 (S.C. 2004); State v. McCall, 612 S.E.2d 453 (S.C. 2005).  Those charges included criminal conspiracy, failure to stop when signaled by law enforcement, resisting arrest with a deadly weapon, armed robbery, assault and battery with intent to kill, and assault and battery of a high and aggravated nature.  See id.  Trial on those charges began in May 2002, after the conclusion of Wood's Greenville County trial, and resulted in convictions and sentences for both Wood and Ms. McCall.  See id.



(ECF No. 39-11 at 7.)  On December 6, 2004, after full briefing and oral argument, the South

Carolina Supreme Court affirmed Wood's convictions and sentence.  See State v. Wood, 607 S.E.2d

57 (S.C. 2004); (App. at 2575, ECF No. 43-5 at 98).  Wood petitioned for rehearing, which the court

denied on January 20, 2005.  (App. at 2585, ECF No. 43-5 at 108.)[3]

*First Post-Conviction Relief Action*

Wood filed a *pro se* application for post-conviction relief ("PCR") on July 28, 2005.  See

Wood v. State of South Carolina, 05-CP-23-04737; (ECF No. 43-5 at 112).  Subsequently, the PCR

court appointed attorneys James A. Brown, Jr., and Symmes Culbertson to represent Wood in his

PCR proceeding.  (ECF No. 39-2.)  Mr. Culbertson was later replaced by Bill Godfrey, Esquire.

(See ECF No. 40-3.)

On February 9, 2007, through Mr. Brown and Mr. Culbertson, Wood filed a second amended

PCR application, raising the following claims:

**Ground A**

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth
and Fourteenth Amendments to the United States Constitution and Article I, Section
14 of the South Carolina Constitution and South Carolina law including S.C. Code
Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to investigate,
challenge and present evidence impeaching the testimony of Karen A. McCall, a
witness for the prosecution during the verdict or penalty phase of the trial
proceedings.  Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground A

(1)     Karen McCall provided testimony identifying Mr. Wood as the perpetrator
        of the murder in response to questioning by the prosecution.  Further, she

---

[3] Wood appealed the South Carolina Supreme Court's decision through a petition for writ
of certiorari in the United States Supreme Court, but did not present this issue.  (See ECF No. 40-5
at 2.)



testified that she "was forced to drive" the vehicle in question. This testimony portrayed Ms. McCall as the victim of Mr. Wood's activities.

(2)     However, testimony elicited by agents of the State in another trial indicates that Ms. McCall voluntarily participated in the events involving Mr. Wood on December 6, 2000.

(3)     Further, SLED testing of Ms. McCall's hands indicates that "Round lead particles found on the palms and backs of both hands of Karen Pittman McCall, SLED Trace Dept. Report, 3.1.01. Ila Simmons and Joseph Powell.

(4)     Trial counsel failed to examine Ms. McCall regarding her involvement in the criminal activity or to correct this impression presented by the prosecution. Further, trial counsel failed to present the results of the GSR testing.

(5)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

## Ground B

Application [sic] was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to present sufficient evidence and sufficiently articulate a request for an instruction for voluntary manslaughter. Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground B

(1)     During the verdict phase of the trial, the defense requested an instruction regarding a lesser included offense of voluntary manslaughter. However, the trial court denied this request and the Supreme Court of South Carolina affirmed this decision.

(2)     However, the Trial Counsel failed to present testimony that the traffic stop was conducted in contradiction of the guidelines promulgated by law enforcement.

(3)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

## Ground C

As an alternative ground to Ground B, Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to concede guilt during the verdict phase of the proceedings. Florida v. Nixon, 543 U.S. 175 (2004) and Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground C

(1)     During the verdict phase of the case, the trial counsel presented a "he didn't do it" defense.

(2)     However, during the penalty phase of the proceeding, trial counsel presented a "he can act better mitigation."

(3)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

## Ground D

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to accept the trial court's offer to instruct the jury that a defendant is required to plead not guilty in order to obtain jury sentencing.  Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground D

(1)     Trial Counsel offered to instruct the jury that to tell the jury that "the individual wished to plead guilty, but in order to submit the sentencing issue to them we would go through the process of trial first."

(2)     This instruction was not provided to the jury

(3)     Trial counsel failed to object to the failure to charge this instruction.

(4)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.



**Ground E**

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to object to the testimony of from [sic] medical providers of the South Carolina Department of Mental Health. Estelle v. Smith, 451 U.S. 454 (1981); Buchanan v. Kentucky, 483 U.S. 402 (1987); Powell v. Texas, 492 U.S. 680 (1989); Hudgins v. Moore, 524 S.E.2d 105 (S.C. 1999); Thomas-Bey v. Nuth, 67 F.3d 296 (Unpublished, 4th Cir. 1995); and Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground E

(1)     An evaluation of Mr. Wood was conducted related to the capital matter over the objection of his capital trial counsel.

(2)     This evaluation included a request for information with a view to the use of this information at sentencing.

(3)     Capital trial counsel was unaware that this information could be used at sentencing or during any step during the trial process as no issue was raised concerning criminal responsibility, competency to stand trial, or ability to conform conduct to the requirements of the law.

(4)     Trial counsel failed to object to the presentation of this evidence outside of the limited purpose for which this evaluation was ordered.

(5)     This presentation violated Mr. Wood's right to remain silent and right to the effective assistance of counsel.

(6)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

**Ground F**

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to prevent access to Mr. Wood by the South Carolina Department of Mental Health. Estelle v. Smith, 451 U.S. 454 (1981); Buchanan v. Kentucky, 483 U.S. 402 (1987); Powell v. Texas, 492 U.S. 680 (1989); Hudgins v. Moore, 524 S.E.2d 105 (S.C. 1999); Thomas-Bey v.



Nuth, 67 F.3d 296 (Unpublished, 4th Cir. 1995); and Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground F

(1)     An evaluation of John Wood was conducted by the South Carolina Department of Mental Health.

(2)     Trial counsel was able to deny [] the Department access to John Wood during February 2002 by letter notifying the trial judge of the denial of such access.

(3)     Trial counsel did not prevent such access after the September 21, 2001 hearing regarding the evaluation related to the capital trial but before the February 2002 denial of access.

(4)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

## Ground G

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to expose the incorrect diagnosis of the medical providers from the South Carolina Department of Mental Health.  Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground G

(1)     The South Carolina Department of Mental Health diagnosed Applicant with Anti-social personality disorder.

(2)     However, no evidence supports this diagnosis and the medical providers conducted a less than adequate investigation into the background of Mr. Wood.

(3)     This diagnosis contradicts that of the doctors from the South Carolina Department of Corrections, who currently treat Mr. Wood.

(4)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

## Ground H

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to present mitigating evidence at the penalty phase of the trial. 1 ABA Standards for Criminal Justice (2d ed. 1982 Supp.), Wiggins v. Smith, 539 U.S. 510 (2003); Rompilla v. Beard, 125 S. Ct. 2456 (2005); Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground H

(1)     During the penalty phase of the trial below, no pleas of mercy were presented by any family member of Mr. Wood nor was any information presented demonstrating Mr. Wood's "capacity to be of emotional value to others."

(2)     This information was available at the time of the trial.

(3)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

## Ground I

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to object [to] improper closing arguments of the prosecutor. Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground I

(1)     During the prosecutor's closing of the guilt phase of this trial, the prosecutor argued that the jury was "looking for factual support to support any suggestion he didn't have the requisite intent." This shifted the burden of proof to the defendant.

(2)     Further, in the penalty phase, the prosecutor argued that a cop killer is a king in prison.

(3)     Also, in the penalty phase closing, the prosecutor argued that "this is not Susan Smith. This is not a man who is going to be sitting in prison worrying about having killed her two children."



(4)     Trial counsel failed to object to these arguments.

(5)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

## Ground J

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to object to the prosecution['s] introduction of evidence relevant to an arbitrary factor during the penalty phase of the trial.  Strickland v. Washington, 466 U.S. 668 (1984) and State v. Burkhart, – S.E.2d – , 2007 WL 80036 (S.C. 2007).

Supporting Facts for Ground J

(1)     During the penalty phase of the proceedings, the state introduced evidence regarding the privileges available to an inmate who receives a sentence of life without parole.  These privileges include access to the yard, work, education, meals, canteen, library, recreation, mail, and outside visitors.

(2)     In the closing argument, the prosecution argued that prison "is like being in a big city—in a little city.  You've got a restaurant.  You've got a canteen. You've got a medical center.  You got a gymnasium.  You've got fields to work out in.  They give you clothing. You get contact visits with your family. You've got TV.  You play cards and games.  You've got a social structure. You've freedom of movement....Thirty or forty acres to live in. Watch ball games on the TV.  You go to school....Based on what John Richard Wood was doing, prison is just about going to be a change of address and nothing more.  He will see his baby every weekend, and that baby will sit in his lap."

(3)     This evidence and argument injected arbitrary factors into the sentencing proceeding.

(4)     Trial counsel failed to object to this evidence and argument.

(5)     But for counsel's deficient performance, the outcome of the trial proceedings would have been different.

**Ground K**

Applicant was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 14 of the South Carolina Constitution and South Carolina law including S.C. Code Sections 16-3-26(B)(1) and 17-23-60 by trial counsels' failure to object to the equal protection violation created by the aggravating circumstances making Mr. Wood death eligible. Strickland v. Washington, 466 U.S. 668 (1984).

Supporting Facts for Ground K

(1)    During the sentencing phase of the trial, the prosecution sought the death penalty based upon one alleged aggravating circumstance, to wit: The murder of a state law enforcement officer during or because of the performance of his official duties.

(2)    The designation of the murder of a law enforcement officer as an aggravating circumstance for purposes of imposing the death penalty violates equal protection by placing higher worth on the value of officers' lives.

(3)    Trial counsel failed to object to this equal protection violation.

(4)    But for counsel's deficient performance, the outcome of the proceedings would have been different.

Wood v. South Carolina, 05-CP-23-4737; (ECF No. 40-15) (some citations omitted) (errors in original). The PCR court held an evidentiary hearing from March 6–8, 2007. (See App. at 2697–3407, ECF No. 44-1 at 34–44-7 at 8.)

On December 19, 2007, following the hearing and briefing from both sides, the PCR court dismissed Wood's application. (App. at 3633, ECF No. 45-2 at 92 ("PCR Order").) Wood moved for reconsideration, and the PCR court denied that motion. (ECF No. 45-4 at 21, 55.)

*PCR Appeal*

On appeal, Wood, represented by Mr. Dudek and Senior Appellate Defender Joseph L. Savitz, III, presented the following issues in his petition for writ of certiorari:

1. Whether the post-conviction relief court erred by ruling that defense counsel was not ineffective for failing to object to general prison conditions evidence purporting to show that prison was like "a city" with many amenities, since this evidence was inadmissible and improper because it did not focus on Petitioner's character or the circumstances of his crime, and this Court years ago held such prison conditions evidence and circumstances of execution evidence were improper in <u>State v. Plath</u>?

2. Whether defense counsel were ineffective at sentencing when they failed to object to the Solicitor's closing argument that, if the jury sentenced Petitioner to life imprisonment, he would "rise in the hierarchy of the prison" and be the "leader" and "king" of a prison gang, as this argument was not supported by the evidence or any reasonable inference drawn therefrom and so infected the proceeding with unfairness as to make the resulting death sentence a denial of due process?

3. Whether defense counsel were ineffective at sentencing by failing to secure the testimony of Petitioner's sister, Connie, who would have pleaded for mercy on his behalf and for the sake of his infant son, and would have corroborated the limited expert mitigation testimony counsel did present?

(ECF No. 40-6 at 3.) After full briefing, the South Carolina Supreme Court denied Wood's petition

(ECF No. 40-16) and the remittitur issued on November 26, 2012 (ECF No. 40-8).[4]

### *Federal Habeas Corpus*

This action commenced on December 7, 2012, with Wood's request to stay his impending

execution and for the appointment of counsel. (ECF No. 1.) On September 19, 2013, Wood filed

his federal petition for writ of habeas corpus, raising the following grounds:

I. Petitioner's right to an impartial trial before an impartial jury, guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, was violated as a result of the trial court's decision to excuse a potential juror for cause.

---

[4] The court notes that Respondents included a petition for rehearing in the Record of State Court Proceedings; however, that document pertains to a different case. (<u>See</u> ECF No. 40-7.) And neither party references a petition for rehearing in its procedural background.



II.  Petitioner's right to a fair and reliable determination of the appropriate punishment in a capital case, guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, was violated as a result of the trial court's ruling that South Carolina's death penalty statute was constitutional in mandating that defendants must forego their right to jury sentencing if they plead guilty to the charged offenses.

III.  Petitioner's right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution was violated when trial counsel failed to object to the prosecution's introduction of evidence relevant to an arbitrary factor during the penalty phase of the trial.

IV.  Petitioner's Sixth, Eighth, and Fourteenth Amendment rights were violated by the solicitor's improper closing argument during the penalty phase of petitioner's capital trial.

V.  Petitioner's right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution was violated when trial counsel unreasonably failed to object to multiple comments in the solicitor's closing argument.

VI.  Petitioner's right to the effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution was violated when trial counsel failed to adequately investigate and present the full range of mitigating evidence.

VII.  Petitioner's rights to the effective assistance of counsel and due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when defense counsel's opening statement at the penalty phase improperly shifted the burden to the defense to prove why a life sentence was appropriate and when defense counsel failed to object to the improper preprinting of juror names on the death sentencing sheet.

VIII.  Petitioner's due process right to a fair trial was violated by the trial court's admission of victim impact evidence, where "law enforcement" was portrayed as the "victim."

IX.  Petitioner's right to the effective assistance of appellate counsel as guaranteed by the sixth amendment to the United States Constitution was violated by appellate counsel's failure to raise the issue of whether the trial court erred in denying the defense's motions to bar and limit the admission of victim impact evidence and overruling defense's objection to the state's victim impact evidence.



X.     Petitioner's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution was violated by the State's failure to disclose material, exculpatory evidence that would have undermined the credibility of a key prosecution witness, and by the State's presentation of testimony it knew to be false.

(Pet., ECF No. 85.)

Along with the Petition, Wood filed a motion to stay his federal proceedings while he pursued his unexhausted claims in state court. (ECF Nos. 85, 86.) The court stayed this case on October 23, 2013. (See ECF No. 93.)

*Second PCR Action*

On September 26, 2013, Wood filed a second PCR application in state court alleging the following grounds for relief:

10(a): Applicant was denied the right to effective assistance of counsel – guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution – during the sentencing phase of his capital trial as a result of trial counsel's acts or omissions set forth below in section 11(a). Trial counsel's performance was both unreasonable and prejudicial as outlined below. *See Strickland v. Washington*, 466 U.S. 668 (1984), *Wiggins v. Smith*, 539 U.S. 510 (2003), *Von Dohlen v. State*, 360 S.C. 598, 602 S.E.2d 738 (2004).

11(a): Trial counsel's acts or omissions included:

    (i)     Counsel failed to object to comments by Solicitor Ariail during summation, which inaccurately and improperly stated that the prosecution "can only seek it [the death penalty] where the murderers are mean and evil people based on the circumstances of the crime."

    (ii)     Counsel failed to object to comments by Solicitor Ariail during summation which inaccurately and improperly stated that imposition of the death penalty was warranted, because prison life is simply "a change of address and nothing more," because "prison is like being in a city. You've got a restaurant, you've got a medical center [ . . . ] [you] watch ball games on TV."

(iii)    Counsel failed to object to comments by Solicitor Ariail which improperly asserted that applicant deserved the death penalty for systemic reasons beyond the facts of applicant's case: "It's a tragedy, potentially, if not properly addressed, on a much greater level, and that is how it effects law enforcement and the very foundation of a free society."

(iv)    Counsel failed to object to Solicitor Ariail's implication that the jury's decision would have long-term consequences on the community and which injected larger societal issues into the proceedings beyond the facts of applicant's case. Solicitor Ariail improperly urged the jury "on behalf of [. . .] the people of this community to let that bell ring, to let them know that anyone who is involved in the killing of a law enforcement officer in the line of duty who is there to protect the rest of us, that such conduct will not be tolerated and will receive the ultimate punishment under the law."[5]

(v)    Counsel improperly shifted the burden to the defense to prove why a life sentence was appropriate, rather than argue that the State carries the burden, and a sentence of life is in fact the default presumption. Counsel stated: "I know that you believe that John Wood deserves to die for what you have convicted him of. I know that just the crime itself is enough." Counsel merely requested that the jury listen to mitigating evidence, and "if you keep listening in spite of these feelings that I really believe you and you had, even though it's perhaps impossible to imagine that you could justify not executing John Wood, I would hope that you would find a reason to choose life–even for John Wood."

(vi)    Counsel failed to object to pre-printed names of jurors on the aggravating circumstances/death verdict form provided to the jury foreperson which clearly implied that it was the proper and expected role of each juror to sentence applicant to death.[6]

10(b): Applicant was denied the right to effective assistance of counsel – guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution – during the sentencing phase of his capital trial as a result of trial counsel's failure to adequately develop

---

[5] Ground 10/11(a)(i)–(iv) corresponds with unexhausted portions of Wood's federal habeas Ground Five.

[6] Grounds 10/11(a)(v)–(vi) corresponds with Wood's federal habeas Ground Seven.



and present the full range of mitigating evidence as set forth below in section 11(b). Trial counsel's performance was both unreasonable and prejudicial as set forth below. *See Strickland v. Washington*, 466 U.S. 668 (1984), *Wiggins v. Smith*, 539 U.S. 510 (2003), *Von Dohlen v. State*, 360 S.C. 598, 602 S.E.2d 738 (2004).

11(b):  Trial counsel's acts or omissions included:

(i)  Counsel failed to adequately investigate mitigation evidence, including the failure to call any member of applicant's family, despite the fact that applicant's sister was available and willing to testify at trial.  Counsel failed to do a complete, or even adequate, social history investigation, speaking with only applicant's girlfriend (and co-defendant) and sister, and gathering virtually no institutional records.  *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (determining that counsel should investigate and consider presenting, among other things, "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences").

(ii)  Counsel failed to adequately develop and present evidence that applicant has significant mental impairments, including cognitive deficits, learning disabilities and brain damage, autism spectrum disorder and temporal lobe epilepsy.  A pretrial neuropsychological evaluation revealed that applicant had significant indicators of brain damage, including: (1) a statistically significant split between verbal and non-verbal IQ; (2) visual perceptual deficits; (3) increased brain power in certain areas coexisting with decreased brain power in other areas in a pattern consistent with dementia; and, (4) excessive numbers of coherence abnormalities, which is a condition often seen in cases of brain damage where, to help compensate for brain damage, brain function has come to involve mass action rather than more normal, differentiated action.  However, trial counsel unreasonably failed to present this powerful mitigating evidence or investigate further.  Additionally, based on initial investigation and research, applicant exhibits many symptoms of autism spectrum disorder (ASD) and temporal lobe epilepsy (TLE).  TLE usually manifests itself with scarring on the temporal lobe that causes neurons to misfire, ultimately resulting in seizures.  The incidence of TLE in violent criminals is surprisingly high.  *See* EVE LAPLANTE, SEIZED 215 (2003).  Applicant's symptoms and indicators of TLE include: (1) parasthesias, which is a condition, commonly associated with seizures, where the patient experiences a sensation of tingling,

PJG

burning, pricking, or numbness, (2) memory difficulties, (3) auditory and visual hallucinations, (4) hyper-religiosity (5) abnormal EEG results; and, (6) a neuropsychological test battery indicating significant brain damage.

(iii)     Trial counsel also failed to investigate and present evidence that applicant has suffered from sexual abuse.[7]

10(c):     Applicant was denied the right to effective assistance of appellate counsel – guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution – when appellate counsel committed the acts or omissions set forth below in Section 11(c). Appellate counsel's performance was both unreasonable and prejudicial as set forth below. *See Strickland v. Washington*, 466 U.S. 668 (1984).

11(c): Appellate counsel failed to raise the improper presentation of victim impact evidence issue on direct appeal, as the effects of the crime on police officers were presented as a "glimpse" into the life of the victim. This issue was preserved and well litigated at trial, as counsel objected to the testimony as "essentially [. . .] professional victim impact presentation as opposed to personal family presentation." Trial counsel's motion was denied, and the officer subsequently testified that many "young troopers have come to me because their spouses [. . .] come to them and say 'Hey, I want you out [of law enforcement].'" This testimony is unduly prejudicial, as it improperly broadens the scope of "victim" impact to include effects on the entire law enforcement community. *See Payne v. Tennessee*, 501 U.S 808 (1991).[8]

10(d): Applicant's Sixth, Eighth, and Fourteenth Amendment rights to a fundamentally fair sentencing proceeding were violated by the solicitor's improper closing argument during the penalty phase of applicant's capital trial.

11(d): Solicitor Ariail made the following improper statements during the penalty phase summation:

(i)     He inaccurately and improperly stated that the prosecution "can only seek it [the death penalty] where the murderers are mean and evil people based on the circumstances of the crime."

(ii)     He inaccurately and improperly stated that imposition of the death penalty was warranted, because prison life is simply "a change of

---

[7] Ground 10/11(b) corresponds with Wood's federal habeas Ground Six.

[8] Ground 10/11(c) corresponds with Wood's federal habeas Ground Nine.



address and nothing more," because "prison is like being in a city. You've got a restaurant, you've got a medical center [. . .] [you] watch ball games on TV."

(iii)    He improperly asserted that applicant deserved the death penalty for systemic reasons beyond the facts of applicant's case: "It's a tragedy, potentially, if not properly addressed, on a much greater level, and that is how it effects law enforcement and the very foundation of a free society."

(iv)    He improperly implied that the jury's decision would have long-term consequences on the community and which injected larger societal issues into the proceedings beyond the facts of applicant's case. Solicitor Ariail improperly urged the jury "on behalf of [. . .] the people of this community to let that bell ring, to let them know that anyone who is involved in the killing of a law enforcement officer in the line of duty who is there to protect the rest of us, that such conduct will not be tolerated and will receive the ultimate punishment under the law."[9]

10(e): Applicant's Eighth and Fourteenth Amendment rights guaranteeing a fundamentally fair sentencing hearing were violated by the trial court's admission of victim impact evidence which improperly portrayed "law enforcement" as the "victim." *See Payne v. Tennessee*, 501 U.S. 808 (1991).

11(e): At trial, the court improperly permitted testimony that portrayed the broader law enforcement community as a victim of the crime. This issue was preserved and well litigated at trial, as counsel objected to the testimony as "essentially [. . .] professional victim impact presentation as opposed to personal family presentation." The defense pointed to *Payne v. Tennessee*, 501 U.S. 808 (1991), and its narrow holding that only permits "a brief glimpse of the life [of the victim]." Trial counsel's motion was denied, and the officer subsequently testified that many "young troopers have come to me because their spouses [. . .] come to them and say 'Hey, I want you out [of law enforcement].'" Moreover, the officer testified to the broader psychological impact of the crime, saying that "[t]his particular situation has opened a lot of eyes to a lot of people within the law enforcement community simply because you never know whether it could be a tractor trailer or it could be a moped. You don't know what you're dealing with anymore." This testimony is unduly prejudicial, and improperly broadens the scope of "victim" impact to include effects on the entire law enforcement community. *See Payne v. Tennessee*, 501 U.S. 808 (1991). Furthermore, the prejudicial effect of this testimony was exacerbated when,

---

[9] Ground 10/11(d) corresponds with Wood's federal habeas Ground Four.



during closing arguments at the penalty phase, the solicitor argued that failing to impose a death sentence would detrimentally affect law enforcement as a whole and the ability of law enforcement to do their jobs.[10]

10(f): Applicant's right to Due Process, guaranteed by the Fourteenth Amendment to the United States Constitution, was violated by the State's failure to disclose material, exculpatory evidence that would have undermined the credibility of a key prosecution witness, and by the State's presentation of testimony it knew to be false.

11(f): At applicant's Greenville County trial in February 2002, the State called Karen McCall, applicant's co-defendant. McCall testified that as she and applicant were being pulled over by a police officer, applicant "stomped his foot on the gas," saying "I shot the son of a bitch [*sic*]" and waiving a gun at her so that she would continue to drive. She said that applicant "reached over [her] and pushed the [rear window] button himself" in order to open the rear window during the subsequent shoot out. McCall testified that she was "afraid to die, and . . . didn't want [her] baby to die," saying that she "thought [applicant] was going to kill [her and her baby] and then kill himself." When asked what she was doing during the chase and shootout, McCall said she was praying. During his closing argument, the solicitor repeatedly referred to McCall's testimony to illustrate applicant's "meanness." Shortly thereafter, during applicant's Anderson County trial held in May 2002, SLED agent Gene Donohue testified that he and another agent investigated McCall's jeep to assess whether her account of the events was even possible, in other words, "if it was possible to . . . commandeer the vehicle from the passenger seat" and "if you could control the driving, control the gas, control the brakes." Agent Donohue testified that "[y]ou can't reach th[e] accelerator from the passenger side *at all*" due to the configuration of the car model and the console that was installed in the car at the time. Agent Donohue went on to say that "in order to reach the [rear window] switch, . . . you actually have to lay across the dashboard and the steering wheel to even reach over it." All of these SLED experiments relating to the passenger's access to the rear window control and the accelerator were conducted on December 15, 2000, more than a year before applicant's Greenville trial–the trial where the State portrayed McCall as a devout and pregnant hostage coerced by someone who was "mean and rotten to the core." Thus, well before the Greenville trial, the solicitor knew or should have known that SLED agents had assessed the plausibility of McCall's account and already determined that multiple aspects of the account were implausible. The State's failure to disclose this exculpatory, material evidence within its possession violated applicant's right to due process. *See Kyles v. Whitley*, 514 U.S. 419, 432 (2002); *Brady*, 373 U.S. at 87–88; *cf. Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) (holding that *Brady* suppression occurs even if favorable evidence is known only to police investigators and not prosecutor).

---

[10] Ground 10/11(e) corresponds with Wood's federal habeas Ground Eight.



Moreover, the State presented evidence that it knew to be false in violation of applicant's right to due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).[11]

<u>Wood v. State of South Carolina</u>, 2013-CP-23-05190; (ECF No. 134-1) (errors in original) (citations to record omitted). In an order dated July 19, 2016, the PCR court dismissed Wood's second PCR application as untimely and improperly successive under state law. (<u>See</u> ECF No. 135-1.) Wood moved to alter or amend the court's order (ECF No. 135-2), and the state court denied that motion by order dated August 3, 2017 (ECF No. 135-3).[12] Upon full resolution of Wood's state court proceedings, this court lifted the stay in Wood's federal habeas corpus action. (<u>See</u> ECF No. 126.)

Since Wood filed his petition, he has elected to withdraw Grounds One, Eight, and Nine. (<u>See</u> ECF No. 150 at 1.) In addition, Wood has recently reported a lack of evidence supporting one portion of Ground Six. (<u>See</u> ECF Nos. 183, 186.) Accordingly, this Report and Recommendation will only address Grounds Two through Seven and Ground Ten.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

---

[11] Ground 10/11(f) corresponds with Wood's federal habeas Ground Ten.

[12] Accordingly, all of Wood's federal habeas claims have now been fully exhausted. However, because the state court dismissed his second PCR petition for procedural reasons on adequate and independent state law grounds, any claims not exhausted through his original PCR application, PCR appeal, and direct appeal remain procedurally barred.



evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

## B.    Habeas Corpus Standard of Review

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), claims adjudicated on the merits in a state court proceeding cannot be a basis for federal habeas corpus relief unless the decision was "contrary to, or involved an unreasonable application of clearly established federal law as decided by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2). When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in

its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 410 (2000); see also White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (describing an "unreasonable application" as "objectively unreasonable, not merely wrong" and that "even clear error will not suffice") (internal quotation marks and citation omitted); Harrington v. Richter, 562 U.S. 86, 100 (2011); Humphries v. Ozmint, 397 F.3d 206 (4th Cir. 2005); McHone v. Polk, 392 F.3d 691 (4th Cir. 2004). Moreover, state court factual determinations are presumed to be correct and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)); see also White, 134 S. Ct. at 1702 (stating that " '[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement' ") (alteration in original) (quoting Harrington, 562 U.S. at 103). Under the AEDPA, a state court's decision "must be granted a deference and latitude that are not in operation" when the case is being considered on direct review. Harrington, 562 U.S. at 101. Moreover, review of a state court decision under the AEDPA standard does not require an opinion from the state court explaining its reasoning. See id. at 98 (finding that "[t]here is no text in [§ 2254] requiring a statement of reasons" by the state court). If no explanation accompanies the state court's decision, "the federal court should 'look through' the unexplained

PJG

decision to the last related state-court decision that does provide a relevant rationale" and "should then presume that the unexplained decision adopted the same reasoning." <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018). "[T]he State may rebut the [court's] presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." <u>Id.</u>

Pursuant to § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. <u>Id.</u> at 102. "If this standard is difficult to meet, that is because it was meant to be." <u>Id.</u> Section 2254(d) codifies the view that habeas corpus is a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Id.</u> at 102–03 (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).

### C. Exhaustion Requirements

A habeas corpus petitioner may obtain relief in federal court only after exhausting his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." <u>Matthews v. Evatt</u>, 105 F.3d 907, 911 (4th Cir. 1997), <u>abrogated on other grounds by</u> <u>United States v. Barnette</u>, 644 F.3d 192 (4th Cir. 2011); <u>see</u> <u>also</u> <u>In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases</u>, 471 S.E.2d 454, 454 (S.C. 1990) (holding that "when the claim has been presented to the Court of Appeals or the Supreme Court, and relief has been denied, the litigant shall be deemed to have

exhausted all available state remedies"). To exhaust his available state court remedies, a petitioner must "fairly present[] to the state court both the operative facts and the controlling legal principles associated with each claim." Longworth v. Ozmint, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks and citation omitted). Thus, a federal court may consider only those issues which have been properly presented to the state appellate courts with jurisdiction to decide them. Generally, a federal habeas court should not review the merits of claims that would be found to be procedurally defaulted (or barred) under independent and adequate state procedural rules. Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008); Longworth, 377 F.3d 437; see also Coleman v. Thompson, 501 U.S. 722 (1991). For a procedurally defaulted claim to be properly considered by a federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

## D. Respondents' Motion for Summary Judgment

### 1. Ground Two

In Ground Two, Wood challenges the South Carolina Supreme Court's denial of his claim that South Carolina's death penalty statute, South Carolina Code Section 16-3-20(B), unconstitutionally requires a sentencing proceeding before a judge when a defendant pleads guilty to murder. Wood argues that South Carolina's statute violates his Fifth,[13] Sixth, Eighth, and Fourteenth Amendment rights. Under the Sixth and Fourteenth Amendments, Wood claims the statute violates his right to a jury sentencing in a capital trial, denies him the mitigating effect of

---

[13] The court notes that Wood does not specifically articulate a Fifth Amendment claim in his habeas petition or elsewhere in the briefing. (See Pet., ECF No. 85 at 9–11; Traverse, ECF No. 150 at 10–15.)



admitting guilt, and impinges his Fourteenth Amendment right to due process. In support, Wood relies on <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), and <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978). Wood also asserts that South Carolina's statute violates his Eighth Amendment rights by introducing an arbitrary factor "in that the defendant must either be sentenced by a judge or force the jury to endure a meaningless guilt-or-innocence phase, followed by a sentencing proceeding during which the jury may or may not know (depending on the judge) that the defendant did not want to contest guilt in the first place." (Pet., ECF No. 85 at 10.) Respondents counter that: (1) Wood's Eighth Amendment argument was not properly preserved at the trial level and is defaulted; (2) <u>Ring</u> is inapplicable where a defendant waives his right to a jury trial; and (3) "there is no unfair muting of mitigating effect" because nothing prevents the defendant from conceding guilt before the jury during the guilt or innocence phase. (<u>See</u> Return, ECF No. 137 at 51–61.)

Wood's trial counsel first presented this issue in a motion to quash the State's notice to seek the death penalty, asserting a denial of due process. (<u>See</u> App. at 2519–21, ECF No. 43-5 at 42–44.) After briefing and a hearing, the trial court found the statute constitutional and denied Wood's motion, but offered to address the issue during jury selection. (App. at 2521, ECF No. 43-5 at 44.) At trial, the court again expressed willingness to raise the issue with the jury:

> **Mr. Mauldin**: All right. The next [motion], your honor, was motion filed November the 21st where we requested a quashing of the death notice where the defendant - - under statutory scheme the defendant was required to enter a plea of not guilty and the sentence - - do you remember that motion?
> **The Court**: I do.
> **Mr. Mauldin**: All right.
> **The Court**: And I also remember either I told you on the bench or put it in a footnote in the order that that struck me as a very sound argument. I don't believe it's constitutionally in firm [sic] to have- - -
> **Mr. Mauldin**: I'll hand you my note, your honor. What I wrote you said, and I think that's exactly what you said.



**The Court**: It doesn't rise to a constitutional violation. But from a practical standpoint I can understand the benefit a party would seek to obtain by that initial admission on the front end in the inability to plead guilty to a judge and then submit sentencing to a jury.

**Mr. Mauldin**: Yes, sir.

**The Court**: And I offered from the bench and/or in writing to address that and to handle that during jury selection if defense counsel so desired.

**Mr. Mauldin**: Yes, sir.

**The Court**: So I was willing to tell the jury that the individual wished to plead guilty, but in order to submit the sentencing issue to them we would go through the process of a trial first. And then if you had desired that, we would have had long discussions of how we could approach that with the jury and things of that nature.

**Mr. Mauldin**: Yes, Sir.

**The Court**: I specifically remember that one. It struck a chord with me.

**Mr. Mauldin**: Yes, Sir. And the way our [statute] is set up is just the way it's set up. But we don't believe that it's appropriate the way it's set up where it requires - - well, I'm not going to go through and rehash the argument.

**The Court**: Right. And my ruling stands on that.

(App. at 1005–06, ECF No. 42-1 at 27–28.) Nothing in the record suggests Wood's trial counsel took advantage of the court's offer.

On appeal, the South Carolina Supreme Court made the following finding:

Appellant asserts <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), renders unconstitutional the requirement in S.C. Code Ann. § 16-3-20(B) (2003) that the sentencing proceeding be held before the judge when a defendant pleads guilty to murder.

As we recently stated in <u>State v. Downs</u>, 361 S.C. 141, 604 S.E.2d 377 (2004), the capital-sentencing procedure invalidated in <u>Ring</u> does not exist in South Carolina. Arizona's statute required the judge to factually determine whether there existed an aggravating circumstance supporting the death penalty regardless whether the judge or a jury had determined guilt. Ariz. Rev. Stat. § 13-703(C) (2001) (amended 2002); <u>Ring</u>, 536 U.S. at 597. In South Carolina, conversely, a defendant convicted by a jury can be sentenced to death only if the jury also finds an aggravating circumstance and recommends the death penalty. S.C. Code Ann. § 16-3-20(B) (2003); <u>Sheppard v. State</u>, 357 S.C. 646, 652, 594 S.E.2d 462, 466 (2004). As we noted in <u>Downs</u>, <u>Ring</u> did not involve jury-trial waivers and is not implicated when a defendant pleads guilty. Other courts have also reached this conclusion. Therefore, appellant's argument is without merit.



State v. Wood, 607 S.E.2d 57, 61 (2004) (some citations omitted).  Wood contends that the South Carolina Supreme Court's decision unreasonably applied clearly established federal law, specifically Ring v. Arizona.  Wood asserts that Ring is directly applicable to this case and invalidates South Carolina's death penalty statute because it deprives him of a constitutional right to plead guilty and have a jury determine the aggravating circumstances necessary to impose the death penalty.

In Ring, the United States Supreme Court found that Arizona's capital sentencing structure violated the Sixth Amendment right to a jury trial in capital prosecutions.  Under Arizona's statute, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required" under the statute for imposition of the death penalty.  Ring, 536 U.S. at 588.  Applying its reasoning from Apprendi,[14] the Court found that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" a defendant has a right to submit those factors to a jury for determination.  Id. at 609 (quoting Apprendi, 530 U.S. at 494 n.19).  Thus, Ring established that when a defendant exercises his right to a jury trial on a capital offense, he is entitled to have a jury determine any aggravating factors necessary to impose the death sentence.  Importantly, as noted by the Fourth Circuit in ruling on Virginia's capital sentencing scheme, which is functionally equivalent to South Carolina's,[15] Ring did not hold "that a defendant who pleads guilty to capital

---

[14] Apprendi v. New Jersey, 530 U.S. 466 (2000) (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

[15] Under Virginia's capital sentencing scheme, when a defendant is charged with a death-eligible offense, the trial court first submits the issue of guilt or innocence to a jury.  If the defendant is found guilty, then the same jury decides the penalty.  However, if the defendant pleads guilty and waives his right to a jury determination of guilt, the trial judge conducts the sentencing proceeding alone and determines the existence of any aggravating factors.  See Va. Code Ann. § 19.2-257.



murder and waives a jury trial under the state's capital sentencing scheme retains a constitutional right to have a jury determine aggravating factors." Lewis v. Wheeler, 609 F.3d 291, 309 (4th Cir. 2010). Further, "the Ring decision did not clearly establish or even necessarily forecast that a capital defendant who pleads guilty and waives his right to a jury trial can insist upon a jury trial on aggravating factors." Id. at 310.

Here, where Wood did not plead guilty and received a jury determination of both guilt and penalty, Ring is especially inapplicable. The court cannot find that the South Carolina Supreme Court's decision unreasonably misapplied clearly established federal law. Rather, the state court made a valid distinction between Arizona's statutory scheme and South Carolina's and applied similar reasoning as the Fourth Circuit's in reaching its conclusion that South Carolina's statute violates neither the Sixth nor the Fourteenth Amendments.

Notably, Wood's Eighth Amendment argument does not expressly appear in the record prior to this habeas petition.[16] Thus, the court agrees with Respondents that this portion of Wood's claim is procedurally defaulted. Wood has neither acknowledged the default nor advanced an argument for cause and prejudice. Moreover, because Wood did not plead guilty and did not accept the trial court's offer to address the reason for his technical plea with the jury, a prejudice finding on this issue would seem untenable.

For the reasons stated above, the court finds that Wood is not entitled to habeas relief on this ground, and summary judgment should be granted on Ground Two.

---

[16] (See, e.g., Final Br. of Appellant, ECF No. 39-11 at 24–29.)

## 2.    Ground Three

In Ground Three, Wood asserts that his trial counsel were ineffective for failing to object to the State's presentation of evidence on prison conditions during the penalty phase of his trial. The PCR court considered this claim on the merits and found counsels' performance deficient, but found no resulting prejudice. (See App. at 3723–25, ECF No. 45-3 at 70–72.)

To demonstrate ineffective assistance of counsel, a petitioner must show, pursuant to the two-prong test enunciated in Strickland v. Washington, 466 U.S. 668 (1984), that (1) his counsel was deficient in his representation and (2) the petitioner was prejudiced as a result. Id. at 687; see also Williams v. Taylor, 529 U.S. 362, 391 (2000) (stating that "the Strickland test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims"). To satisfy the first prong of Strickland, a petitioner must show that trial counsel's errors were so serious that his performance fell below the objective standard of reasonableness guaranteed by the Sixth Amendment to the United States Constitution. To satisfy the second prong of Strickland, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Harrington, 562 U.S. at 105. While " '[s]urmounting Strickland's high bar is never an easy task[,]' . . . [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Id. (quoting Padilla v. Kentucky, 559 U.S. 356, 371 (2010)). The standards created under Strickland and § 2254(d) are both " 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. (citations omitted). Thus, when a federal habeas court reviews

a state court's ineffective assistance of counsel determination, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Id.</u>

The Supreme Court has held that a decision containing a reasoned explanation is not required from the state court. <u>See</u> <u>Wilson</u>, 138 S. Ct. at 1192. As stated above, if no explanation accompanies the state court's decision, a federal habeas petitioner must show that there was no reasonable basis for the state court to deny relief. In the case at bar, this court has the benefit of the PCR court's written opinion, certiorari review of which was denied by the South Carolina Supreme Court, which may provide reasons or theories that the appellate court could have relied upon in summarily denying Wood's petition. Therefore, for the ineffective assistance of counsel claims raised in state court, the court turns to the question whether the PCR court's order unreasonably misapplied federal law or was based on an unreasonable determination of the facts. Here, Wood contends the PCR court's denial was based on an unreasonable application of <u>Strickland</u> and an unreasonable determination of the facts. (<u>See</u> Traverse, ECF No. 150 at 8.)

      a.      **Relevant Background**

During the penalty phase, the State called James Sligh, Classification Director for the South Carolina Department of Corrections, to "establish what life in prison without parole means and to have a discussion as to the difference between life in prison without parole versus the punishment of death." (App. at 1876, ECF No. 42-7 at 116.) The solicitor noted that the issue of prison conditions had been raised in the opening statements, and, after an off-the-record discussion with co-counsel, Wood's attorney, Mr. Mauldin, stated that he did not object as long as Mr. Sligh's

PJG

testimony was limited to conditions of life without parole. (See App. at 1876–77, ECF No. 42-7 at 116–17.)

On direct examination, Mr. Sligh testified regarding security classifications and general differences between life on death row and life in the general population. In describing the prison amenities available to general population inmates, Mr. Sligh agreed that a prison is kind of like a "mini city" and discussed the cafeteria, laundry, canteen, educational opportunities, vocational training, and recreational activities. (App. at 1882–89, ECF No. 42-7 at 122–29.) Mr. Sligh also testified that inmates in general population are allowed contact visitation and have more freedom of movement. (App. at 1890–92, ECF No. 42-7 at 130–32; App. at 1898, ECF No. 42-8 at 7.) Mr. Sligh then described death row, where inmates spend most of the day in their cell, are allowed only one hour of recreation, have noncontact visitation, and are restrained in leg irons, handcuffs, and a belly chain any time they leave the cell. (App. at 1892–94, ECF No. 42-7 at 132–34; App. at 1895–1902, ECF No. 42-8 at 1–8.) Mr. Sligh also testified that violent incidents among inmates are more limited on death row. (App. at 1898, ECF No. 42-8 at 4.)

On cross-examination, the defense elicited testimony that, if convicted to life in prison, Wood would be confined to a level three, high security institution for the rest of his life, with other violent offenders. (App. at 1905–06, 1907, 1909–10, ECF No. 42-8 at 11–12, 13, 15–16.) Mr. Sligh testified that the Department of Corrections had the resources, manpower, and authority to control Wood. (App. at 1906, ECF No. 42-8 at 12.) He agreed with defense counsel that prior institutional behavior is a good predictor of how someone may act in prison. (App. at 1906, ECF No. 42-8 at 12.) And, he testified that the presence of gangs and the less restricted freedom of movement created a greater safety risk for inmates in the general population than death row. (App. at 1908–10, ECF No.

42-8 at 14–16.)  In sum, Mr. Sligh agreed that prison is a "tough place with tough people."  (App. at 1910, ECF No. 42-8 at 16.)

On redirect, Mr. Sligh testified that the crime the inmate committed can also be a good indicator of how he will behave in prison, that the guards do not use corporal punishment or deadly force except in extreme circumstances, and that the majority of inmates make it through their time in prison without being involved in a violent incident.  (App. at 1911–18, ECF No. 42-8 at 17–24.)

Subsequently, the defense called James Aiken as an expert in future prison adaptability and risk assessment of prisoners.  (App. at 2034–35, ECF No. 43-1 at 56–57.)  Mr. Aiken testified that, generally, death row is a safer place than general population.  He described predator groups and gangs in the general population and opined that Wood could be an easy target due to his size and weight.  (App. at 2039–41, ECF No. 43-1 at 61–63.)  Mr. Aiken also offered his expert opinion, based partially on a review of Wood's past institutional behavior, that the Department of Corrections would have no problem housing Wood for the rest of his life without an undue risk of harm to the prison staff, community, or other inmates.  (App. at 2041, ECF No. 43-1 at 63.)  The solicitor did not cross-examine Mr. Aiken.  (See App. at 2044, ECF No. 43-1 at 66.)

At the PCR evidentiary hearing, Mr. Mauldin initially testified:

> And I did not enter an objection [to Mr. Sligh's testimony] because I was under the impression that this testimony was going to relate to whether or not John Wood individually would constitute a future danger, but it was a prison adaptability within the Department of Corrections setup.  Looking back, if I knew that that was what the testimony was going to be, I probably would not object even knowing what I know now, because with my witness to come in after him I would want to have the second bite at the apple so to speak.

(App. at 3045, ECF No. 44-4 at 68.)  However, Mr. Mauldin then testified that Mr. Sligh's testimony was clearly irrelevant, he should have objected, and that his objection would have been sustained.



(App. at 3046–47, ECF No. 44-4 at 69–70.) On cross-examination, Mr. Mauldin stated that he made a conscious decision not to object, but he did not remember the basis for that decision, or what he discussed with co-counsel during their off-record conference. (App. at 3110–14, ECF No. 44-5 at 7–11.) And, on redirect, Mr. Mauldin reiterated that he could not recall a reason for not objecting, telling PCR counsel, "I just cannot imagine what the heck I was thinking." (App. at 3125, ECF No. 44-5 at 22.)

Wood's other trial attorneys testified that the sentencing phase was primarily Mr. Mauldin's responsibility, and neither could remember exactly what was discussed in the off-the-record conference, but that it must have related to the decision not to object. (See App. at 3309–11, 3373–74, ECF No. 44-6 at 72–74, 136–37.)

### b.     PCR Court's Decision

After reciting the relevant facts and discussing the applicable state law regarding admission of prison condition evidence, the PCR court applied the following standard: "In the sentencing phase, Applicant must show 'there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" (App. at 3723, ECF No. 45-3 at 70 (quoting Jones v. State, 504 S.E.2d 822, 823 (S.C. 1998))).[17] The PCR court then weighed the aggravating and mitigating circumstances, finding:

> Here, we have as extremely aggravated a crime as there could be. It would be bad enough if Applicant had merely murdered Trooper Nicholson; however, Applicant's subsequent wild chase provides an incredible amount of further aggravation. Applicant wounded another officer with a gunshot to the face, ran civilians off the road, commandeered a Blue Ridge truck at gunpoint, and only by luck or grace was not a good enough shot to kill more police officers or innocent civilians with his

---

[17] While the PCR court did not cite directly to Strickland, this portion of Jones quotes Strickland's prejudice standard. See Jones, 504 S.E.2d at 823 (quoting Strickland, 466 U.S. at 695).



repeated gunfire. Applicant had a prior record and had been in prison before, and the victim impact evidence in this case was particularly moving. Compared to this, there is limited mitigation, with no family members and relatively mild mental health testimony without findings of psychosis or delusion at the time of the offense. There was evidence in rebuttal that Applicant was anti-social.

(App. at 3724, ECF No. 45-3 at 71.)

The PCR court went on to note that the defense benefitted from allowing the State to present

its evidence:

Through cross of Sligh and presentation of James Aiken, the defense elicited how tough prison is, how Applicant would be far more susceptible to danger in general population than on death row, and how Applicant would likely be at the mercy of predator groups inside the general population of prison given his small stature and older age.

(App. at 3724, ECF No. 45-3 at 71.) Thus, the PCR court concluded:

Given the relative equality of presentation by both sides on the issue of conditions of confinement, it cannot be said there is a reasonable probability of a different result. Had counsel objected to the State's evidence on the issue, it would not have been allowed to make its own points along these lines as well. Given the overwhelming evidence in aggravation and the limited evidence in mitigation, admission of both the State's and defense's evidence of conditions of confinement does not establish Strickland prejudice. Since evidence from both sides came before the jury, argument on the subject was proper as within record, and the fact that both sides made argument on this issue does not change the calculation.

(App. at 3724–25, ECF No. 45-3 at 71–72.)

c.    **Analysis**

Wood asserts the PCR court's finding is "clearly unreasonable." (Traverse, ECF No. 150 at

6.) First, Wood suggests both state and federal law on this issue were clear at the time of Wood's

trial. Wood is correct in his statements that the law at the time "require[d] the jury to make an

individualized determination of punishment specific to the crime and the defendant" and that "a

capital sentencing decision must be based on factors related to the offender as an individual . . . ."

(Traverse, ECF No. 150 at 6 (citing <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976); <u>California v. Brown</u>, 479 U.S. 538 (1987); <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978))). And it appears the principles espoused in these cases influenced the PCR court's finding that counsel were deficient in failing to object to Mr. Sligh's testimony. (<u>See</u> App. at 3715–19, ECF No. 45-3 at 62–66 (discussing string of South Carolina cases evaluating the relevance of prison condition evidence to the individualized determination of punishment)). As Wood notes, admission of an arbitrary factor, such as conditions of confinement, may invite prejudice. (<u>See</u> Traverse, ECF No. 150 at 6–7.) However, nothing in federal jurisprudence requires a finding that admission of evidence of conditions of confinement prejudiced the defendant.

Rather, in assessing prejudice in the penalty phase of a capital case, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Strickland</u>, 466 U.S. at 695. Considering the totality of the evidence before the jury, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." <u>Id.</u> at 696. The PCR court properly stated and applied this standard. (<u>See</u> App. at 3723, ECF No. 45-3 at 70.)

Next, Wood questions the PCR court's reliance on the "relative equality of presentation by both sides on the issue of conditions of confinement." (Traverse, ECF No. 150 at 7.)[18] Wood suggests that the PCR court's reasoning fails to account for the weight attributed to this error by the

---

[18] Wood presents this as a response to Respondents' argument that Wood did not suffer prejudice because both sides presented evidence on conditions of confinement. (Traverse, ECF No. 150 at 7.) That portion of Respondents' brief is from the PCR court's order, so, for the purposes of proper habeas review, the court will construe this as an assertion of error by the PCR court.



South Carolina Supreme Court in <u>State v. Burkhart</u>, 640 S.E.2d 450 (S.C. 2007). In <u>Burkhart</u>, the South Carolina Supreme Court reversed a death sentence where both the defense and the State presented similar evidence on prison conditions during the sentencing phase of the trial because the evidence "invited the jury to speculate about irrelevant matters" and injected an arbitrary factor in the proceedings in violation of S.C. Code Ann. § 16-3-25(C)(1) (2003). <u>Id.</u> at 453.

The reasoning in <u>Burkhart</u> could, arguably, factor into a prejudice analysis under <u>Strickland</u>. Considering the PCR court's detailed discussion of <u>Burkhart</u>, it is reasonable to conclude that it too recognized the relevance of the case to its analysis. (<u>See</u> App. at 3718–19, ECF No. 45-3 at 65–66.)

Further, Wood raised this argument to the PCR court in his motion to reconsider, reasoning that "Mr. Wood's sentence should be reversed for the same constitutional reasons as was Mr. Burkhart's." (Supp. App. at 41, ECF No. 45-4 at 43.) There is nothing to suggest that the PCR court did not account for this argument before declining to reconsider its decision and denying Wood's motion. (<u>See</u> Supp. App. at 63, ECF No. 45-4 at 65.)

Moreover, the South Carolina Supreme Court has recently clarified that <u>Burkhart</u>, which found a statutory violation on direct appeal, does not support an automatic finding of prejudice once an arbitrary factor has been introduced. <u>Bowman v. South Carolina</u>, 809 S.E.2d 232, 245–46 (S.C. 2018). Rather, collateral review of an ineffective assistance of counsel claim is subject to <u>Strickland</u>'s prejudice prong. <u>Id.</u> at 246 (upholding the PCR court's finding of no prejudice under <u>Strickland</u> where the evidence of guilt and aggravating factors were overwhelming).

Finally, Wood claims that the PCR court's reliance on the highly aggravated nature of the crime failed to consider the length of time the jury deliberated before reaching a sentencing decision. (Traverse, ECF No. 150 at 8.) According to Wood, the fact that the jury deliberated for



approximately two days shows that the jury "did not find the issue of sentence to be a quickly resolved issue." (Id.) Wood's contention appears to be that the jury found the evidence more equally weighted than the PCR court, so the PCR court's determination was unreasonable. However, Wood neither asserts nor points to any evidence that the jury's indecisiveness resulted from admission of evidence of conditions of confinement or that it was due to any mitigating evidence that the PCR court failed to consider in its analysis. Thus, Wood fails to tie any perceived prejudice to counsel's alleged ineffective act or omission and the court will not presume prejudice. See Strickland, 466 U.S. at 693 ("Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.").

In sum, after a full review of the record, the court finds that Wood has failed to show that the PCR court's application of Strickland's standards was unreasonable. Further, Wood has failed to establish that the PCR court's denial of Wood's claims in Ground Three was contrary to federal law or based on any unreasonable factual findings. Accordingly, the court recommends granting summary judgment on Ground Three.

### 3. Grounds Four and Five

Grounds Four and Five challenge a number of statements by the solicitor in his penalty phase closing argument. Wood presents Ground Four as an independent claim that the solicitor's closing argument was improper. Wood did not properly present Ground Four to the state courts in a procedurally viable manner when he had the opportunity— i.e., through direct appeal— and the state courts have now found this claim procedurally defaulted under state law. (See ECF No. 135-1 at 54–56.) Thus, Ground Four is procedurally barred from federal habeas review, absent a showing of



cause and prejudice. See Coleman, 501 U.S. at 750. Wood has not expressed any particular cause

for his default of this ground and, because Ground Four is not a claim of ineffective assistance of

trial counsel, his reliance on Martinez v. Ryan, 566 U.S. 1 (2012), in Ground Five cannot extend to

Ground Four. Nor has Wood asserted his actual innocence. See id.; Bousley v. United States, 523

U.S. 614, 622 (1998). Accordingly, Ground Four remains procedurally barred.

In Ground Five, Wood argues that trial counsel were ineffective for failing to object to those

statements. The statements at issue fall into four general categories: (1) references to a prison

hierarchy and Wood's potential placement within it; (2) comments on the legislative limitations on

seeking the death penalty and the solicitor's decision to seek the death penalty in this case; (3) a

description of prison conditions; and (4) a call for the jury to send a message to the community with

its sentence.

It is well established that a prosecuting attorney must act within "the bounds of . . . propriety

and fairness." Berger v. United States, 295 U.S. 78, 84 (1935). In exercise of that duty, a prosecutor

may not make "improper insinuations and assertions calculated to mislead the jury." Id. at 85.

Nonetheless, the Supreme Court has made clear that a prosecutor's improper remarks violate the

Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a

denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v.

DeChristoforo, 416 U.S. 637, 643 (1974)). To obtain relief, therefore, a petitioner must show the

prosecutor's argument to be (1) improper and (2) so prejudicial as to have denied the petitioner a fair

trial. United States v. Lighty, 616 F.3d 321, 359 (4th Cir. 2010). In evaluating prejudice, the

reviewing court should consider:

PJG

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

United States v. Mitchell, 1 F.3d 235, 241 (4th Cir. 1993) (internal quotation marks omitted). "Courts must conduct a fact-specific inquiry and examine the challenged comments in the context of the whole record." Bennett v. Stirling, 842 F.3d 319, 323 (4th Cir. 2016) (citing United States v. Young, 470 U.S. 1, 11-12 (1985)).

When reviewing a claim of ineffective assistance of counsel, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (quotation omitted). Generally, an attorney's failure to object can be "the product not of ineffectiveness but of strategy." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016); see also Humphries v. Ozmint, 397 F.3d 206, 234 (4th Cir. 2005) (Luttig, J., concurring) ("[I]t is well established that failure to object to inadmissible or objectionable material for tactical reasons can constitute objectively reasonable trial strategy under Strickland."). Further, courts have found that, "[b]ecause many lawyers refrain from objecting during opening and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." Cunningham v. Wong, 704 F.3d 1143, 1159 (9th Cir. 2013) (quoting United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993)).

In his original PCR application, Wood asserted that trial counsel were ineffective for failing to object to three portions of the solicitor's penalty phase closing argument, including his references



to a prison hierarchy, and the PCR court addressed that claim on the merits (See App. at 3705–11, ECF No. 45-3 at 52–58). Accordingly, that portion of Ground Five is preserved for review and the court will address it first.

### a.    Prison Hierarchy

Here, Wood points to his trial counsel's failure to object to the solicitor's claim that Wood would enjoy a high position in prison because he killed a police officer:

> And if [Wood] got away and he went to prison for life, he would become a part of that hierarchy. And they say we didn't want to bring anything to the table, but let me tell you what he would bring to the table. What is the most despised aspect that an inmate has? What does he dislike the most? The cop who put him there. And you are sending a man to prison who is a cop killer. He'll be a king. He will rise in the hierarchy of the prison, and he will be a leader.

(App. at 2191, ECF No. 43-2 at 88.)

### i.    PCR Evidence and Decision

On direct examination at the PCR evidentiary hearing, Mr. Mauldin, who took the lead in the penalty phase, stated that his failure to object to this portion of the solicitor's closing argument was not based on any strategic decision. (App. at 3041–42, ECF No. 44-4 at 64–65.) On cross-examination, Mr. Mauldin testified that he was not sure he would object even in hindsight. (App. at 3107–08, ECF No. 44-5 at 4–5.) And, when asked if he did not object because the solicitor was making a responsive argument to Mr. Aiken's testimony, Mr. Mauldin did not recall factoring that into his decision. (App. at 3108, ECF No. 44-5 at 5.) On redirect, Mr. Mauldin reiterated: "My failure to object to that I'm not going to say was because there had been testimony in the record supporting that. I don't remember that being the case." (App. at 3108, ECF No. 44-5 at 5.) And

again stated, "I don't know if I'd object if I heard it right now. . . ." (App. at 3018, ECF No. 44-5 at 5.)

Based on this evidence and a review of the trial record, the PCR court found that the solicitor's argument was "within the evidence and inferences" of the record. (App. at 3709, ECF No. 45-3 at 56.) The PCR court noted that, during the penalty phase, Wood's attorneys had elicited testimony from Mr. Aiken that "'there is nothing that would indicate [Wood] would ever be allowed into an unofficial hierarchy in a prison setting,'" and reasoned that "the solicitor was merely raising his own contrary inference in response to this defense evidence." (App. at 3709, ECF No. 45-3 at 56 (quoting App. at 2043, ECF No. 43-1 at 65).) Having found the solicitor's argument permissible as an invited response to defense evidence, the PCR court determined that trial counsel could not have been deficient in, nor Wood prejudiced by, the failure to object. (App. at 3710, ECF No. 45-3 at 57.) Further, in denying the claim, the PCR court concluded:

> Even if the comment was error, this Court finds neither a due process violation nor ineffective assistance from the failure to object. This one comment in the context of an entire sentencing hearing for an extremely aggravated crime with limited mitigation would not have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Donnelly, 416 U.S. at 643. Had counsel objected, perhaps the comment would have been stricken and a curative instruction given. Considering the brief nature of the comment, a mistrial was not warranted, and this Court finds the absence of such an instruction in no way prevented [Wood] from receiving a fair trial.

(Id.)

### ii.     Analysis

Wood asserts the PCR court's conclusion that the solicitor's argument was a permissible response to Mr. Aiken's earlier testimony is based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. (Traverse, ECF No. 150 at 26.)

According to Wood, "Aiken never testified to any position in the prison hierarchy that petitioner might develop and, as trial counsel later acknowledged, there was no evidence in the record that supported the solicitor's prison-leader inference." (Id. (citing trial counsel's PCR testimony regarding this claim).) The court disagrees.

During the penalty phase, trial counsel called Mr. Aiken to testify as an expert on future prison adaptability and risk assessment of prisoners. (See App. at 2034–35, ECF No. 43-1 at 56–57.) Mr. Aiken testified generally about the differences between life on death row and in maximum security. (See App. at 2038–40, ECF No. 43-1 at 60–62.) Several times, Mr. Aiken referred to predator groups and gangs in the prison general population and testified that Wood may be a target because of his smaller stature, race, and age. (App. at 2039–43, ECF No. 43-1 at 61–65.) Specifically regarding a prison hierarchy, Mr. Aiken offered the following opinion:

> **Q** And in terms - - there is some hierarchy in the prison system among the inmates, would that be a fair statement?
> **A** When you have human beings confined, there is a hierarchy, yes.
> **Q** And it depends upon what you bring to the table whether you are in the hierarchy or not?
> **A** That's correct.
> **Q** And based on your observation and your assessment of Mr. Wood, does he bring anything to the table to be in the hierarchy?
> **A** There is nothing that would indicate that he would ever be allowed into an unofficial hierarchy in a prison setting.

(App. at 2043, ECF No. 43-1 at 65.) The solicitor did not cross-examine Mr. Aiken. (See App. at 2044, ECF No. 43-1 at 66.)

The court finds that Mr. Aiken's testimony directly supports the PCR court's decision. Mr. Aiken did testify regarding the prison hierarchy and Wood's potential place within it, and the evidence suggests the solicitor's statement at closing was in response to this testimony. The

language in the solicitor's argument even mirrors trial counsel's questions during Mr. Aiken's testimony. (Compare Aiken Testimony, App. at 2043, ECF No. 43-1 at 65 ("[D]oes [Wood] bring anything to the table to be in the hierarchy?"), with Solicitor's Closing Argument, App. at 2191, ECF No. 43-2 at 80 ("[L]et me tell you what he would bring to the table").) Thus, Wood has failed to show by clear and convincing evidence that the PCR court's factual determination was unreasonable in light of the evidence before it.

Wood has pursued his state remedies with regard to the remaining portions of Ground Five through his second PCR application, but Wood did not raise these claims in his original PCR application and, therefore, they are procedurally defaulted. Wood relies on Martinez to overcome the default, asserting that Wood's PCR counsel were ineffective in failing to raise these claims.

Generally, any errors of PCR counsel cannot serve as a basis for cause to excuse a petitioner's procedural default of his claims. See Coleman, 501 U.S. at 752. However, in Martinez, the United States Supreme Court established a "limited qualification" to that rule. Martinez, 566 U.S. at 15. The Martinez Court held that inadequate assistance of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." Id. at 9. In describing its holding in Martinez, the Supreme Court has stated:

> [w]e . . . read Coleman as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

Trevino v. Thaler, 569 U.S. 413, 423 (2013) (quoting Martinez, 566 U.S. at 14, 17–18); see also Sexton v. Cozner, 679 F.3d 1150, 1159 (9th Cir. 2012) (summarizing the Martinez test to require the following: "a reviewing court must determine whether the petitioner's attorney in the first collateral proceeding was ineffective . . ., whether the petitioner's claim of ineffective assistance of trial counsel is substantial, and whether there is prejudice").

Thus, to excuse the procedural default of any of Wood's proposed ineffective assistance of counsel claims in Ground Five, he must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that [he] must demonstrate that the claim has some merit." Martinez, 566 U.S. at 14 (comparing Miller-El v. Cockrell, 537 U.S. 322 (2003) (describing standards for certificates of appealability)).[19] Further, he must "show that [PCR] counsel's representation during the post-conviction proceeding was objectively unreasonable, and that, but for his errors, there is a reasonable probability that Petitioner would have received relief on a claim of ineffective assistance of trial counsel in the state post-conviction matter." Sexton, 679 F.3d at 1157; see also Williams, 529 U.S. at 391 (stating that "the Strickland test provides sufficient guidance for resolving virtually all ineffective assistance-of-counsel claims"); Strickland v. Washington, 466 U.S. 668, 687 (1984) (stating to demonstrate ineffective assistance of counsel, a petitioner must show that (1) his counsel was deficient in his representation, *i.e.* that counsel's errors were so serious that his performance was below the objective standard of reasonableness guaranteed by the Sixth Amendment to the United States Constitution, and (2) he was prejudiced as a result).

---

[19] The court notes that in Miller-El, the Supreme Court explained that to make the requisite substantial showing of the denial of a constitutional right, "a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.' " Miller-El, 537 U.S. at 336 (quoting Slack v. McDaniel, 463 U.S. 880, 484 (1983)).



### b. Statutory Limitations and Personal Opinion

In this portion of Ground Five, Wood alleges trial counsel were ineffective for failing to object to the solicitor's statement that the State can only seek the death penalty in limited circumstances and his references to his own decision to seek the death penalty in this case. Specifically, Wood asserts the impropriety of the following excerpts:

> Now, I'm going to tell you again it's a tough decision, and we know it's a tough decision. It was a tough decision - - it's a tough decision for me to ask you to make a tough decision. But responsible people make tough decisions.
>
> . . . .
>
> Now, why is the death penalty appropriate in this case? . . . There are mean and evil people in this world who do not deserve to continue to live with us regardless of how well confined they are, and that's why the death penalty is appropriate. And John Richard Wood is such a mean and evil person. . . .
>
> And the law limits the right of the state to seek the death penalty. We can't seek it in every murder. We can only seek it in certain murders. And we can only seek it in those cases where the murderers are mean and evil people, based on the circumstances of the crime, and that's what we're doing in this case. John Wood is such a person.

(App. at 2184, 2186–87, ECF No. 43-2 at 81, 83–84.)

Wood argues the solicitor's comments regarding the statutory limitations on seeking the death penalty are simply not true. In support, Wood lists cases where the state courts have "broadly" interpreted the aggravating circumstances in South Carolina's death penalty statute, and offers statistics about the number of death-eligible cases. (Traverse, ECF No. 150 at 21–22.)

This argument is unavailing. The solicitor's comment that he cannot seek the death penalty in every murder case is true. South Carolina's death penalty statute does limit the cases in which the State may seek the death penalty. See S.C. Code Ann. §§ 16-3-20(B), (C)(a) (1996) (stating death

PJG

sentence only imposed upon finding of statutory aggravating circumstance and enumerating those statutory aggravating circumstances).

More significantly, Wood asserts the solicitor's comments injected his personal opinion and non-record facts into the jury's deliberations and undermined the jury's sense of responsibility, in violation of State v. Woomer, 284 S.E.2d 357 (S.C. 1981), and Caldwell v. Mississippi, 472 U.S. 320 (1985).

In Caldwell, the United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."  472 U.S. at 328-29 (finding an Eighth Amendment violation for telling jury that Mississippi Supreme Court would review any death sentence).  "[T]o establish a Caldwell violation, a defendant must necessarily show that the remarks to the jury improperly described the role assigned to the jury by local law." Romano v. Oklahoma, 512 U.S. 1, 9 (1994) (internal quotation marks omitted).

In Woomer, the South Carolina Supreme Court found such a violation where "the solicitor attempted to minimize the juror's own sense of responsibility for appellant's fate by stressing that he had himself already made the same decision that he was now asking them to make."  284 S.E.2d at 359–60.  There, the solicitor's comments regarding his own role and decision clearly equated his role to that of the jury's in making a sentencing decision:

> You know, the initial burden in this case was not on you all.  It was on me.  I am the only person in the world that can decide whether a person is going to be tried for his life or not.  I mean I had the same thing you all did.  I had to make up my mind in regards to this and under the law, if there is any question about it, you ask the judge, I have to make the first decision as to whether or not a person is going to be tried for the electric chair.  If I didn't want him tried for the electric chair, there is no way the

PJG

Sheriff or anybody else can make it happen. I had to make this same decision, so I have had to go through the same identical thing that you all do. It is not easy.

Id. at 359.

Similarly, in <u>State v. Butler</u>, 290 S.E.2d 420 (S.C. 1982),[20] the South Carolina Supreme Court found an Eighth Amendment violation where the solicitor told the jury in his penalty phase closing:

First, it has to pass over my desk. I make the decision. People elect me to make the decision as to whether or not I think cases ought to be prosecuted. We don't prosecute all the cases. And I think that's one of the hardest impressions sometimes that we have to make, because people think that I am the mouthpiece of the county or the mouthpiece of the police and that everything that comes along Norman Fogle has got to get up there and holler and advocate a position. That is not correct. I have to use my common sense. So I can share with you just to a small degree this morning how each and everyone of you feel, because as I stated yesterday before that in order for this case to get moving as far as the death penalty was concerned I first had to make that decision, you see, and I have in my opinion, based upon the evidence in this case, overall, decided that if we are going to have a death penalty law on the books that if there were any facts that could ever justify it this case justifies it, justifies it.

Id. at 421. The court concluded, "When a solicitor's personal opinion is explicitly injected into the jury's determinations as though it were in itself evidence justifying a sentence of death, the resulting death sentence may not be free from the influence of any arbitrary factor . . . ." <u>Id.</u> Wood argues that the solicitor's comments in his case are very similar to the solicitor's closing argument in <u>Butler</u>.

Wood has failed to establish a substantial claim that his trial counsel were deficient in failing to object to this portion of the solicitor's argument. Here, unlike the cases Wood relies on, the solicitor did not go so far as to compare his role to that of the jury or even emphasize his own decision to seek the death penalty; he merely explained that the State does not choose to pursue the death penalty for every murder charge, so he had to make an affirmative decision to seek death in

---

[20] <u>Butler</u> was overruled on other grounds by <u>State v. Torrence</u>, 406 S.E.2d 315 (S.C. 1991).



this case. The facts of this case are therefore distinguishable and Wood has failed to show that the solicitor's argument was clearly improper under state law. Thus, counsel cannot be said to have been deficient for failing to raise an objection.

Furthermore, Wood has failed to show that he suffered prejudice as a result of his counsel's actions. In the same closing argument, the solicitor reminded the jurors that it was their duty to determine the sentence. (See App. at 2182, 2183–84, 2194, ECF No. 43-2 at 79 ("[T]he first order of business that you will have to address when you return to your jury room is has the state proved an aggravating factor beyond a reasonable doubt."), 80–81 ("[The death penalty] is a legal penalty that you have an option of imposing . . . . And what you are doing is you are shaping a lawful punishment to fit an unlawful act. That is the purpose for which we are engaged at this point. And it is your responsibility, it is given to you under the law, and you accepted it as part of your oath, to carry it out fairly."), 91 ("You have been intrusted [sic] by society, by our system, you twelve have been entrusted as representatives of the community to determine what the appropriate sentence is under the facts of this case. And you know this case now as well as anyone involved. . . . So no one can question your judgment because you have all the facts. And it is your decision and it will be your decision . . . .")).

In addition, the trial judge instructed the jury on the applicable burden of proof and its consideration of evidence in reaching a sentencing decision. (See, e.g., App. at 2216, 2218–25, 2225, ECF No. 43-2 at 113 ("Ladies and gentlemen, having found the defendant, John Richard Wood, guilty of murder, it is now your duty to determine which sentence to impose upon him."), 116–22 (explaining the State's burden in proving the statutory aggravating circumstance and how to weigh mitigating circumstances), 122 ("In arriving at your decision, you are not to allow passion,

prejudice or any other arbitrary factor to influence your judgment. As jurors you must make your decision without bias toward or without prejudice against any party, you must not allow yourself to be governed by passion or sympathy. You are to honor your oath and, in that regard, carefully and impartially consider all the evidence in the case and follow the law as I have explained it to you.")). Thus, Wood has failed to establish a substantial claim that the jury was misled regarding its role or the significance thereof in determining Wood's sentence.

For the foregoing reasons, the court finds that the solicitor's comments regarding the statutory limits on seeking the death penalty and his role in the process did not result in a denial of due process or an Eighth Amendment violation under the Supreme Court's precedent, and Wood has failed to show a substantial claim of ineffective assistance of trial counsel for failing to object to them. See Young, 470 U.S. at 18–19 (finding that it was improper for the prosecutor to express his personal opinion about the respondent's guilt, but, in context, the comment could not have misled the jury); Strouth v. Colson, 680 F.3d 596, 606 (6th Cir. 2012) (concluding that any error in the prosecutor's statement to the jury during the penalty phase of a capital murder trial that "no one is asking you to kill anyone" was harmless and thus reversal was not warranted where other parts of the closing argument emphasized the importance of the jury's role in the process). The court cannot find PCR counsel ineffective for failing to raise an insubstantial claim. Thus, Wood has failed to establish cause and prejudice under Martinez to overcome the default on this portion of Ground Five.

### c. Prison Conditions

Next, Wood asserts trial counsel were ineffective for failing to object to the following portion of the solicitor's closing argument:

Now, let's talk a little bit about life in prison, because we brought some evidence to you and they did too. They brought Mr. Aiken. Mr. Aiken is a long-time employee of the South Carolina Department of Corrections, and he had a lot of interesting things to say.

There's no question in my mind that John Richard Wood can adapt to prison . . . .

Now, you and I may think going to prison for life is serious business. But that's not the issue. The issue is, is going to prison for life serious business for John Richard Wood? Are we really doing anything to John Richard Wood?

Going to prison is like being in a big city - - in a little city. You've got a restaurant. You've got a canteen. You've got a medical center. You've got a gymnasium. You've got fields to work out in. They give you clothing. You get contact visits with your family. You've got T.V. You play cards and games. You've got a social structure. You've got freedom of movement. It might be limited, but you've got freedom of movement. Thirty or forty acres to live in. Watch ball games on the T.V. You go to school. And you do all of those things that you want to. You may not have a car to drive around, and they may limit your travel. And your standards may not be as high as what you're used to. But based on what John Richard Wood was doing, prison is just about going to be a change of address and nothing more.

He will see his baby every weekend, and that baby will sit in his lap.

(App. at 2189–92, ECF No. 43-2 at 86–89.)

Wood argues these statements were based on inadmissible evidence, were unfounded and misleading, expanded the scope of the jury's sentencing decision, heightened the risk of arbitrariness by encouraging the jury to act out of dissatisfaction with South Carolina's penological policies, and violated due process by increasing the risk that Wood's sentence would be based on information he did not have the opportunity to deny or explain and by claiming that anything less than death would be escaping punishment. (See Traverse, ECF No. 150 at 23–24.) Respondents counter that the solicitor's comments were narrowly tailored to Wood's character and, therefore, permissible and that Wood cannot overcome his default of this claim. (Return, ECF No. 137 at 75–77, 80–81.)

Consistent with federal Eighth Amendment jurisprudence, South Carolina requires that "evidence in the sentencing phase of a capital trial must be relevant to the character of the defendant or the circumstances of the crime." Burkhart, 640 S.E.2d at 453. "Such determinations as the time, place, manner, and conditions of execution or incarceration . . . are reserved . . . to agencies other than the jury." State v. Plath, 313 S.E.2d 619, 627 (S.C. 1984). Thus, the South Carolina Supreme Court has cautioned that "[g]enerally, questions regarding . . . prison conditions are not relevant to the question of whether a defendant should be sentenced to death or life imprisonment without parole," and "how inmates, other than the defendant at trial, are treated in prison . . . is inappropriate evidence in the penalty phase of a capital trial." State v. Bowman, 623 S.E.2d 378, 385 (S.C. 2005). However, in recognizing "the tension between evidence regarding the defendant's adaptability to prison life, which is clearly admissible, and this restriction on the admission of evidence regarding prison life in general," the court noted that "evidence of the defendant's characteristics may include prison conditions if narrowly tailored to demonstrate the defendant's personal behavior in those conditions." Burkhart, 640 S.E.2d at 453.

In its discussion above regarding Ground Three, this court determined that the PCR court did not unreasonably err in its consideration of this standard under Strickland and its resulting finding that trial counsel's failure to object to evidence of prison conditions did not prejudice Wood. Wood has not shown that the evidence of conditions of confinement presented during the sentencing phase was impermissible. Thus, the court cannot find that the solicitor's comments on this topic in his closing statement were based on inadmissible evidence. Consequently, Wood has failed to demonstrate a substantial claim of ineffective assistance of counsel based on a failure to object to the solicitor's closing argument.

In addition, Wood fails to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy," or show that, had counsel objected, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 689, 694 (quotation omitted). While Mr. Mauldin did not object, he did respond to the solicitor's comments in his own closing:

> Now, I will say that - - I mean, - - when we went through jury selection, I asked, I suspect, every one of you, I believe I did - - If I didn't, I think I asked enough of you - - to be pretty satisfied that the world outside this courthouse believes life without parole is a serious penalty. I mean, I've never heard such testimony from the government. It almost made me want to go write my senator and say what the heck is going on here? But I'll talk to you a minute about how deceiving that was.

> A plea for life in prison is not a plea for leniency. And if somehow out of this record of this case you have somehow come to that conclusion, then there is nothing I'm going to be able to do to change your mind. It is beyond my comprehension that the government is now telling you as jurors when you are faced with perhaps the most important decision you will ever make that life in prison without parole is not a serious penalty. It's - - that is almost scandalous.

> We are dealing, folks, with the most - - the two most serious penalties that mankind knows of. Bar none. You execute them or you banish them forever. I mean, that's - - I mean, what else are we going to do? So if they're saying we've only got one serious penalty and that's the death penalty, then we are really in serious trouble. That is real serious. We ought to go down to Columbia and start pounding the doors if that's how bad it is.

(App. at 2197–98, ECF No. 43-2 at 94-95.)

Also, in addressing prosecution evidence by Mr. Sligh in his closing, Mr. Mauldin told the jury:

> They wanted to make jail sound soft.

> They - - but I'll tell you a couple of things that I thought were important about his testimony, come to think of it. His testimony was that in this soft prison that the prosecutor gives you, his testimony is that three inmates will be living in a space half the size of that jury box. That's not my words. Those came from the witness stand.



He also said that when a person is convicted of murder and sentenced to life in our state they go into the prison system classified a number three maximum security, which is the highest classification for security purposes that there is, and they die in prison when classified a number three maximum security. It doesn't matter how good they behave or what they do or how much they beg. Their security level never changes.

(App. at 2206, ECF No. 43-2 at 103.)

And, Mr. Mauldin reminded the jury about certain portions of Mr. Aiken's testimony regarding prison conditions:

He said that John Wood could be housed in the prison without causing a risk of any harm to any staff. He said that the prisons had the facilities, the staff, the security systems and the authorization of law to control inmates. He said that John Wood would be assigned to a cell, in fact, the other fellow told you about that too. He said that prisons contain violent, dangerous people for long periods of time. He said that John Wood could and would be placed in closest confinement in maximum security behind bars and fences with guns on the corner regardless of how he acted.

(App. at 2208, ECF No. 43-2 at 105.)

During the penalty phase, both Wood and the State presented evidence of conditions in prison and the differences between what a prisoner would experience on death row versus in the general prison population. It would not be unreasonable for both sides to refer to that evidence to support their closing arguments. Further, it would not be unreasonable for Wood's trial attorney, who had the benefit of making his argument after the solicitor, to choose not to object to the solicitor's comments, but instead to take the opportunity to respond and have the last word on the subject before the jury deliberated. Wood has not offered evidence suggesting counsel's decision not to object was not strategic or reasonable. Accordingly, the court finds no reason to set aside the "strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." <u>Strickland</u>, 466 U.S. at 689. The court therefore finds that this portion of Ground Five does not fall within the narrow <u>Martinez</u> exception and, thus, remains defaulted.

### d. Send a Message

Finally, Wood alleges trial counsel were ineffective for failing to object to the following portion of the solicitor's closing argument:

> But lastly let me point out what is most important about why the death penalty is appropriate, and that is because it is the killing of a police officer in the line of duty. This is more than a regular murder. This is more than your normal killing. And the legislature recognizes that, not because the legislature passed the law, but because it's common sense. It's common sense. Not that Eric's life was more valuable than any other life, it wasn't. All life is valuable, and Eric's life was just as valuable as anyone else's.

> But Eric was a law enforcement officer, and a law enforcement officer - - just like a soldier, just like a fireman - - in the line of duty, that's a special circumstance. That's a unique circumstance. And the reason it is unique is because law enforcement is the blue line that separates good from evil in our society. They are all that separates good from evil.

> . . . .

> And that's why the circumstance is so important. Because without law enforcement . . . crime flourishes and evil people come out of darkness. Without law enforcement there is anarchy. And that's why not Eric's life individually but a law enforcement officer.

> So Eric's death is a tragedy on a personal level, and it's a tragedy potentially, if not properly addressed, on a much greater level, and that is how it affects law enforcement and the very foundation of our free society. And this was nothing more than a major attack on law enforcement.

> Now, in closing, let me tell you one other thing. You have been entrusted by society, by our system, you twelve have been entrusted as representatives of the community to determine what the appropriate sentence is under the facts of this case. And you know this case now as well as anyone involved [in] it and anyone in the community. So no one can question your judgment because you have all the facts. And it is your decision and it will be your decision, and you will speak for the community when you make that decision. And whatever decision you make, it will ring like a bell outside

this courthouse. It will ring like a bell to all of those who will listen and all of those who are listening. And I urge you on behalf of the state of South Carolina and the people of this community to let that bell ring, to let them know that anyone who is involved in the killing of a law enforcement officer in the line of duty who is there to protect the rest of us, that such conduct will not be tolerated and will receive the ultimate punishment under our law.

(App. at 2192–95, ECF No. 43-2 at 89–92.)

Wood contends that asking the jury to send a message with its verdict directly conflicts with Eighth Amendment jurisprudence requiring the jury to base its sentencing decision on an "individualized assessment of the appropriateness of the death penalty." California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). Respondents counter that the solicitor's comments were proper under state law because references to the jury sending a message to the community with its sentencing decision are permissible when they are connected to the appropriateness of the penalty on the facts of the case. See State v. Cain, 377 S.E.2d 556, 592 (S.C. 1988) (finding that the solicitor's statement to the jury that a death penalty verdict would send a message to surrounding counties that "[y]ou don't do that [murder] in Chesterfield County without paying the price" was "no more than [a] recommendation[] by the solicitor as to the appropriateness of the death penalty based on evidence adduced at trial").

However, Respondents acknowledge the applicability of the Fourth Circuit's decision in United States v. Runyon, 707 F.3d 475 (4th Cir. 2013), to this case. In Runyon, the Fourth Circuit disapproved of a prosecutor's messages to a jury to "do your duty" and "send a message to the community, send a message with your verdict." The court reasoned:

> In United States v. Caro, we expressed skepticism about 'the government's comments about messages sent to anyone other than' the defendant, 597 F.3d 608, 625 n.17 (4th Cir. 2010) . . . . To be sure, juries 'express the conscience of the community on the ultimate question of life or death' when they decide whether to

PJG

impose a death sentence.  <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 519 (1968).  But that is different from the prosecution's comment here.  Whereas reminding the jury that it 'express[es] the conscience of the community' nevertheless maintains a proper focus on the defendant (since any 'expression' is directed at the defendant alone), urging it to 'send a message to the community' invites it to play to an audience beyond the defendant—to use its decision not simply to punish the defendant, but to serve some larger social objective or to seek some broader social approval as well.  This latter perspective is at least in tension with the individualized assessment of the defendant's culpability that the Constitution requires.

<u>Id.</u> at 514–15.

But, the court went on to find that "neither comment rendered the proceeding unfair, for 'the complained-of comments were isolated, did not rise to the level of argument that might mislead or inflame the jury concerning its duty or divert it from its task and were made in the context of a case involving compelling evidence of numerous aggravating factors.'"  <u>Id.</u> at 515 (quoting <u>United States v. Higgs</u>, 353 F.3d 281, 331 (4th Cir. 2003)).  In finding that neither comment prejudicially affected the petitioner, the Fourth Circuit also considered the prosecutor's statements in light of the entire closing argument and the judge's instructions to the jury.  The court noted that "the prosecution repeatedly and accurately explained to the jury how it should weigh any aggravating factors it had established against any mitigating factors established by the defense," and the trial court "reinforced these points in its jury instructions."  <u>Id.</u>

In Wood's case, as detailed in the court's analysis of Wood's claim regarding the solicitor's references to the statutory limits on seeking the death penalty and the alleged interjection of his own opinion, Wood has failed to raise a substantial claim of ineffective assistance of trial counsel based on a contention that the solicitor's comments misled the jury about its role in the sentencing process, the applicable burden of proof, or how to apply that burden to the evidence before it.  In addition, Mr. Mauldin directly addressed this portion of the solicitor's argument in his closing statement:



Earlier this week I told you the impact of your verdict, and I want to talk a little bit about - - about that. You know, the impact was - - you know, ringing bells and making you somehow respon- - I mean, he wants to make you personally responsible to the community. I mean, that is not right. That's not our law. That's not what this law does.

What I told you was that your verdict had done two things. It had, in fact, protected the public. Period. And the reason was there were only two sentences available - - life in prison without parole or death. So it has protected the public. The community is protected.

(App. at 2197, ECF No. 43-2 at 94.) Thus, similar to <u>Runyon</u>, the solicitor's statement, in context, did not so infect the proceeding with "unfairness as to make the resulting [verdict] a denial of due process." <u>Donnelly</u>, 416 U.S. at 643.

Further, had trial counsel objected to this portion of the solicitor's argument, he would have highlighted the solicitor's comments and forfeited the opportunity to respond to them in his own closing— leaving the jury with only the solicitor's message before they deliberated. So, the decision not to object may have been strategic. The court finds no reason in the record and Wood has not offered evidence suggesting a reason for the court to conclude otherwise. <u>See</u> <u>Strickland</u>, 466 U.S. at 689 ("[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."). For these reasons, Wood has failed to show that his underlying claim of ineffective assistance of trial counsel is substantial. The court cannot find PCR counsel ineffective for failing to raise an insubstantial claim. Therefore, this portion of Ground Five is not subject to the <u>Martinez</u> exception and remains defaulted.

Wood also argues counsel's deficiency and the resulting prejudice based on the cumulative impact of the solicitor's statements. The court has reviewed the solicitor's comments, both individually and cumulatively, in the context of the whole record and finds that counsel's decision

not to object to these portions of the solicitor's closing argument and, instead, address them in his own closing, or not address them at all, could well have been a product of his "reasonable professional judgment[ ]," Jones v. Barnes, 463 U.S. 745, 754 (1983).[21]  Wood has not provided the court with any reason to conclude otherwise, leaving the court with only his bare assertions.  Wood, therefore, has not overcome Strickland's presumption of reasonableness or demonstrated that the underlying ineffective assistance of trial counsel claims this ground is based upon have "some merit" under Martinez.

In addition, the court is not persuaded by Wood's suggestion that "[t]he jury's lengthy sentencing deliberations—spanning the course of three days—and the jurors' ultimate indication that they were deadlocked indicate that the penalty-phase evidence was not so overwhelming that the result of the sentencing proceeding would not have been different absent these errors."  (Traverse, ECF No. 150 at 26.)  Wood has not cited any authority, nor is the court aware of any, indicating that the length of a jury's deliberations should factor into the court's prejudice analysis.  Nor has Wood affirmatively linked the jury's alleged difficulty reaching a verdict with trial counsel's alleged ineffectiveness in this ground.

Thus, the court cannot excuse the procedural default of Ground Five and recommends granting summary judgment on this ground.

---

[21] See also Fisher v. Angelone, 163 F.3d 835, 852 (4th Cir. 1998) ("Having just determined that none of counsel's actions could be considered constitutional error, . . . it would be odd to say the least, to conclude that those same actions, when considered collectively, deprived [the petitioner] of a fair trial.  Not surprisingly, it has long been the practice of this Court individually to assess claims under Strickland v. Washington").

### 4.     Ground Six[22]

In Ground Six, Wood asserts his trial counsel were ineffective for failing to investigate and present the full range of mitigation evidence available at trial, including (1) an adequate social history and (2) evidence of Wood's mental impairments.  Wood raised his first claim, counsel's failure to adequately investigate and present his social history, in PCR and the PCR court addressed that claim on the merits.  However, while Wood presented several grounds in PCR related to his mental health and evaluations, he did not raise the claim he now presents to the court.  To the extent this portion of Ground Six is procedurally defaulted, Wood asserts cause and prejudice to overcome the default under Martinez due to PCR counsel's ineffectiveness.

In assessing counsel's mitigation investigation and presentation, the court "must conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'"  Wiggins v. Smith, 539 U.S. 510, 523 (2009) (quoting Strickland, 466 U.S. at 688, 689).  Under Strickland,

---

[22] In the petition, Ground Six alleged Wood's trial counsel were ineffective for failing to: (1) call Wood's sister, Connie Jantz, at trial; (2) adequately investigate and present evidence that Wood suffered from mental impairments as evidenced in pre-trial psychological evaluations; and (3) further investigate evidence that Wood may suffer from Autism Spectrum Disorder, Temporal Lobe Epilepsy, or another brain disorder.  (See Pet., ECF No. 85 at 22–25.)  Throughout the briefing period, Wood's counsel continued to gather information regarding Wood's potential brain disorder.  (See Traverse, ECF No. 150 at 33–34.)  Because this investigation was ongoing, counsel requested permission to supplement Wood's Traverse, depending on the results of further testing.  (See Traverse, ECF No. 50 at 34, 34 n.6.)  After a series of subsequent tests and expert reports, Wood's counsel informed the court that they had not discovered evidence conclusively establishing that Wood's existing mental functioning was the result of a long-standing disorder that would have been apparent at the time of trial and, thus, they would not need to supplement their discussion of Ground Six in the Traverse.  (See ECF No. 183.)  Wood's counsel later clarified that they did not waive the entirety of Ground Six, but they did not need to further brief Wood's claim regarding a potential brain disorder.  (See ECF No. 186.)



strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes that particular investigation unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91.

Further, to establish a Sixth Amendment violation, Wood "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." Porter v. McCollum, 558 U.S. 30, 41 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. To assess that probability, the court must "evaluate the totality of the evidence—'both that adduced at trial, and the evidence adduced in the habeas proceeding'— and 'reweig[h] it against the evidence in aggravation.'" Porter, 558 U.S. at 41(quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)).

### a.    Social History

In the Petition, Wood alleges his trial counsel were ineffective for failing to adequately investigate his social history. In particular, he contends counsel were deficient for: (1) only interviewing Wood's girlfriend, Karen McCall, who was also a co-defendant on charges related to this incident, and Wood's sister, Elizabeth Martinez, who participated in a check fraud scheme with Wood and their mother; (2) gathering "virtually no institutional records"; and (3) failing to take reasonable steps to locate Wood's other sister, Connie Jantz. (Pet., ECF No. 85 at 23.)

In the Traverse, Wood re-styled the caption of Ground Six to allege only that trial counsel failed to adequately investigate and present evidence of Wood's mental impairments and brain

damage.  (See Traverse, ECF No. 150 at 30.)  In addition, this section of the Traverse begins with

a "sketch" of Wood's social history, based on evidence from trial and the PCR evidentiary hearing,

and the following statement from Wood's habeas counsel:

> Apart from this thumbnail sketch, provided largely by McCall and his family members, petitioner's social history prior to the time of the crime is a virtual black hole.  Based on undersigned counsel's investigation, it is now apparent that social history records from petitioner's childhood are almost non-existent, and no witnesses who knew petitioner or his family outside their tight, dysfunctional family circle could be found.

(Traverse, ECF No. 150 at 30–31.)  While this statement seems to suggest this portion of Ground

Six lacks merit, counsel have clarified that they are still pursuing this claim, but they focus on trial

counsel's failure to call any family witnesses or locate Ms. Jantz.[23]  (See ECF No. 186 at 1.)

At trial, the jury did not hear directly from any of Wood's family members.  Rather, defense

counsel presented Wood's social history through a social worker, Jeff Youngman.  After

interviewing Wood; Wood's girlfriend, Karen McCall; and one of Wood's sisters, Elizabeth

Martinez; receiving information from Wood's mother; and reviewing certain records (See App. at

1978, 1991–94, 1996–97, ECF No. 42-8 at 84, 97–100, 102–03), Mr. Youngman concluded

> that there is evidence that John Wood's social and emotional functioning as an adult was affected by his family dysfunction, that there is evidence that John Wood's social environment played an adverse role in his level of social and emotional functioning, there is evidence that John Wood's behavior is consistent with that of someone suffering from mental illness, and there is evidence that John Richard Wood . . . has no significant history of prior criminal convictions involving violence against another person.

---

[23] This comports with the claim Wood raised on PCR appeal and properly exhausted: "Whether defense counsel were ineffective at sentencing by failing to secure the testimony of Petitioner's sister, Connie, who would have pleaded for mercy on his behalf and for the sake of his infant son, and would have corroborated the limited expert mitigation testimony counsel did present?"  (See ECF No. 40-6 at 3.)



(App. at 1975, ECF No. 42-8 at 81).

On cross-examination, Mr. Youngman stated he did not talk to Wood's other sister, Ms. Jantz, because "[n]one of the family knows where she's at." (App. at 1991–92, ECF No. 42-8 at 97–98.) He stated he believed she was living in Maryland, but that nobody could locate her. (App. at 1991–92, ECF No. 42-8 at 97–98.) In addition, Mr. Youngman indicated he did not speak with Wood's mother directly, but relied on information passed on by a mitigation investigator. (App. at 1996–97, ECF No. 42-8 at 102–03.) He later stated he had to rely on information from the mitigation investigator because Wood's mother would not make herself available to speak with him. (App. at 2024, ECF No. 43-1 at 46.) Mr. Youngman further testified that it was "virtually impossible" to obtain records and identify individuals to interview due to the frequency with which Wood's family moved and the lack of meaningful relationships in Wood's life. (App. at 2021, ECF No. 43-1 at 43.)

Richard Kerns, the defense team's investigator, brought a picture of Woods as a first or second grader that he testified was supplied by Wood's sister, Ms. Martinez. (App. at 2053, ECF No. 43-1 at 76.)

Dr. Donna Schwartz-Watts, a forensic psychiatrist, indicated she was able to speak with Ms. Martinez and Ms. McCall but that Wood's parents changed their phone number after speaking with the mitigation investigator, so, despite "numerous attempts," she was not able to contact them. (App. at 2067–68, ECF No. 43-1 at 90–91.)

At the PCR evidentiary hearing, Mr. Mauldin testified that, while he did not personally make any direct attempts to contact Ms. Jantz, he knew through his mitigation investigator that Ms. Martinez had written Ms. Jantz letters and attempted to call, but the letters were not responded to

and the phone number had been disconnected. (App. at 3027–30, ECF No. 44-4 at 50–53.) In addition, Mr. Mauldin could not recall any family witness who wanted to testify in the mitigation phase. (App. at 3102, ECF No. 44-4 at 125.) He specifically recalled Wood's mother as "very uncooperative" and testified that she did not express any desire to participate in her son's defense. (App. at 3102, ECF No. 44-4 at 125.) Mr. Mauldin recalled Ms. Martinez as very involved in locating Ms. Jantz and in managing family issues regarding who would take custody of Wood's child while both he and Ms. McCall were incarcerated. (App. at 3102–03, ECF No. 44-4 at 125–26.) Mr. Mauldin could not recall a specific reason for not calling Ms. Martinez as a witness. (App. at 3104, ECF No. 44-5 at 1.) However, Mr. Bannister testified that they did make a strategic decision not to call Ms. Martinez, stating, "after talking with her it just became apparent that she was not going to be - - we couldn't use her." (App. at 3297, ECF No. 44-6 at 60.)

Dr. Schwartz-Watts testified at the PCR evidentiary hearing that Mr. Mauldin took a very organized approach to his mitigation investigation, employing the services of a mitigation specialist and a social worker, in addition to Dr. Schwartz-Watts, and holding regular team meetings to exchange information. (App. at 2856–57, ECF No. 44-2 at 41–42.) She stated the only issue in the preparation of the case was the difficulty everyone had finding Wood's family members. (App. at 2857, ECF No. 44-2 at 42.) But, she was under the impression the mitigation specialist was making sincere efforts to locate them. (App. at 2859, ECF No. 44-2 at 44.)

With the help of an investigator, PCR counsel were able to locate Ms. Jantz (App. at 2671–72, ECF No. 44-1 at 8–9), and she testified at the PCR evidentiary hearing (see App. at 2755–805, ECF No. 44-1 at 92–142). Ms. Jantz spoke with Dr. Schwartz-Watts during the evidentiary hearing and reported she did not know where her parents were at that time, but believed

PJG

they may be in Mexico and that her mother may still be running afoul of the law.  (App. at 2854, ECF No. 44-2 at 39.)  Ms. Jantz testified that PCR counsel were the first attorneys to contact her regarding Wood's case and that she only knew about the case through the news and her sister, Ms. Martinez.  (App. at 2790, ECF No. 44-1 at 127.)  She indicated that, at the time of Wood's arrest, she was living in Harpers Ferry, West Virginia, but that she moved to Maryland in the summer or fall of 2001.  (App. at 2796–97, ECF No. 44-1 at 133–34.)  And, in an effort to keep her mother from finding her, Ms. Jantz had an unlisted phone number and used a post office box for mail.  (App. at 2798–802, ECF No. 44-1 at 135–39.)  However, Ms. Jantz believed Ms. Martinez had her phone number and recalled receiving a letter from Ms. Martinez with a picture of Wood's baby.  (App. at 2801–02, ECF No. 44-1 at 138–39.)  Ms. Jantz stated that if she had testified at trial, she would have asked the jury to spare her brother.  (App. at 2794, ECF No. 44-1 at 131.)

Based on these facts, the PCR court found: trial counsel were "not deficient with regard to seeking family help for background and possible testimony in mitigation"; Wood's family was mostly uncooperative; trial counsel made reasonable efforts to contact Ms. Jantz, but she was unresponsive because of her desire to avoid her family; Wood did not suffer prejudice from the fact that Ms. Jantz did not testify because her testimony was mostly cumulative of Mr. Youngman's and Dr. Schwartz-Watts's trial testimony and would not "create a reasonable probability that the jury would have concluded the balance of aggravating and mitigating circumstances did not warrant death"; and Wood failed to offer evidence showing trial counsel's decision not to call Ms. Martinez was not strategic or present testimony from Ms. Martinez as to information she could have provided at trial.  (App. at 3704–05, ECF No. 45-3 at 51–52.)

Specifically regarding the impact of Ms. Jantz's testimony, the PCR court found:

> Given the introduction of much of the background at trial and the extremely aggravated nature of this crime, this Court is not persuaded that Jantz's request to the jury to spare her brother's life and her mention of the fact that he has a child would create a reasonable probability that the jury would have concluded the balance of aggravating and mitigating circumstances did not warrant death.

(App. at 3704, ECF No. 45-3 at 51.)

Wood has not argued that any of the PCR court's findings are contrary to established Supreme Court precedent or are based on an unreasonable determination of the facts and, after a careful review of the record, the court cannot find the PCR court's decision unreasonable. The record suggests trial counsel's mitigation investigator was attempting to locate and contact Ms. Jantz, including accepting help from Ms. Martinez, who was the only family member providing any assistance. It does not appear that trial counsel or the mitigation team had any reason to know that Ms. Jantz was actively avoiding her family. And, while there is intrinsic benefit to presenting a family member to request mercy, the mitigating information Ms. Jantz testified to at the PCR evidentiary hearing about Wood's childhood and education was presented to the jury through Mr. Youngman's and Dr. Schwartz-Watts's testimony at trial.[24] Ms. Martinez and Wood's mother had criminal records and the evidence suggests Wood's mother was uncooperative and possibly on the run from police. Wood and Ms. Martinez apparently did not identify any other family members to contact. And trial counsel stated they made a strategic decision not to present Ms. Martinez—a statement which, although not thoroughly explained, Wood has not contradicted. Accordingly, the

---

[24] This is even evidenced in the beginning of this section of Wood's Traverse where, with the exception of direct quotations from Ms. Jantz's testimony and the fact that Wood's mother completed his correspondence courses for him, each fact of Wood's social history is supported by either parallel citations to Mr. Youngman's and Ms. Jantz's testimony or citations only to Mr. Youngman's testimony. (See Traverse, ECF No. 150 at 30–31.)



court finds that Wood has failed to show that the PCR court's decision on this portion of Ground Six was unreasonable.

### b.    Mental Impairments

Before his Greenville County trial, Wood requested that his Anderson County counsel move for a competency and criminal responsibility evaluation.[25]  (See App. at 2503, ECF No. 43-5 at 26.) His counsel did so, the court ordered the evaluation, and the State requested the evaluation be available to it for use in the Greenville County case.  (See App. at 2503, ECF No. 43-5 at 26.) Wood's Greenville County trial counsel strongly objected and the trial court held a hearing on the issue.  (See App. at 2433–35, ECF No. 43-4 at 66–68.)  Ultimately, the trial court directed the Department of Mental Health to submit the report to the court and deferred deciding the matter of disclosure until a later date.  (See App. at 2503, ECF No. 43-5 at 26.)

Wood met with the designated examiner, forensic psychiatrist Dr. Prapap Narayan, twice and underwent evaluations by other Department of Mental Health employees.  (See App. at 957, ECF No. 41-9 at 51.)  However, after those initial evaluations, Wood and his trial counsel refused to provide any further information.  (See App. at 962, ECF No. 41-9 at 56.)

During the penalty phase, Mr. Youngman opined Wood's behavior was consistent with someone suffering from a mental illness and suggested Wood had paranoid personality disorder. (App. at 1988, ECF No. 42-8 at 94.)  Mr. Youngman testified that he reviewed the state mental health evaluation in formulating his opinion. (App. at 1992–93, ECF No. 42-8 at 98–99.)

---

[25] Mr. Bannister and Mr. Mauldin originally represented Wood in both the Anderson County and Greenville County matters.  However, after their disagreement with Wood regarding the competency evaluation and at Wood's request, Mr. Bannister and Mr. Mauldin were relieved as counsel in the Anderson County case and the court appointed Bruce Byrholdt.  (See App. at 2433–34, ECF No. 43-4 at 66–67.)



Accordingly, the State was able to review Dr. Narayan's report in full and cross examine Mr. Youngman on the report. (App. at 2017–19, ECF No. 43-1 at 39–41.) However, the court gave a limiting instruction that examination on statements relied upon by the expert were only to be considered as to the assessment of the expert's opinion and not for the truth of the matter asserted. (App. at 2003–15, ECF No. 43-1 at 25–37.) Through this examination, the State introduced inconsistencies in Wood's reports between his two interviews with Dr. Narayan and elicited testimony about a lack of mental health treatment records or any evidence suggesting Wood had mental health issues. (App. at 2017–20, ECF No. 43-1 at 39–42.)

Trial counsel then called their mental health expert, Dr. Schwartz-Watts. Dr. Schwartz-Watts also partially relied on the Department of Mental Health records and testified that Wood's Department of Mental Health neurological examination was completely normal. (App. at 2066, ECF No. 43-1 at 89.) However, she did mention that Wood had a history of mild head injuries as a toddler. (App. at 2066, ECF No. 43-1 at 89.) Based on her review of Wood's records, consultations with other experts, and interviews with Wood, Dr. Schwartz-Watts diagnosed bipolar disorder not otherwise specified and paranoid personality disorder. (App. at 2070, ECF No. 43-1 at 93.) She described those illnesses and Wood's behaviors and symptoms that led her to those diagnoses, including hearing voices and examples of his extreme paranoia and avoidance. (App. at 2071–84, ECF No. 43-1 at 94–107.) When questioned, Dr. Schwartz-Watts specifically opined that Wood did not meet the criteria for antisocial personality disorder because he did not have a history of being in trouble prior to age fifteen. (App. at 2085–86, ECF No. 43-1 at 108–09.) She also opined Wood had not malingered any of his symptoms. (App. at 2086, ECF No. 43-1 at 109.)

PJG

On cross-examination, Dr. Schwartz-Watts stated she agreed with Dr. Narayan's conclusions that Wood was competent to stand trial, could differentiate between right and wrong, and was capable of conforming his conduct to the requirements of the law. (App. at 2118–19, ECF No. 43-2 at 15–16.)

The State called Dr. Narayan as a reply witness. Dr. Narayan testified that the Department of Mental Health's evaluation team included himself, a social worker, a clinical psychologist, and a neurologist. (App. at 2144, ECF No. 43-2 at 41.) When asked about the neurological exam, he responded that Wood's neurological status was normal, but the report was "of significance not from a neurological point of view but from some other information that it contained." (App. at 2145, ECF No. 43-2 at 42.) Based on his assessment, Dr. Narayan diagnosed Wood with history of alcohol, cocaine, and hallucinogen abuse, possible ongoing cannabis abuse, and antisocial personality disorder. (App. at 2148, ECF No. 43-2 at 45.) He did not find evidence of bipolar or paranoid personality disorder. (App. at 2150–51, ECF No. 43-2 at 47–48.) Dr. Narayan described a psychiatric evaluation from the Greenville County Detention Center dated December 11, 2000, indicating Wood suffered from a personality disorder, which the detention center psychiatrist specified as "sociopath." (App. at 2151–52, ECF No. 43-2 at 48–49.) And Dr. Narayan testified regarding other detention center records stating Wood did not exhibit signs of a mood or psychotic disorder or demonstrate any abnormal behavior. (App. at 2152–53, ECF No. 43-2 at 49–50.) In addition, based on several inconsistencies in Wood's interviews and the results of psychological testing, Dr. Narayan opined Wood was malingering. (App. at 2157–59, ECF No. 43-2 at 54–56.)

During closing, trial counsel asserted Wood was mentally ill and had substantially impaired ability to conform to the law. (See App. at 2203–05, 2207, 2209–10, ECF No. 43-2 at 100–102, 104,

106–07.)  At trial counsel's request, the court instructed the jury on three mitigators related to Wood's mental health: (1) mental or emotional disturbance, (2) substantial impairment of the defendant to appreciate the criminality of his conduct or to conform his conduct with the law, and (3) the age or mentality of the defendant at the time of the crime.  (App. at 2223, ECF No. 43-2 at 120.)  In addition, the court instructed the jury that it could consider any non-statutory mitigating factors.  (App. at 2223–24, ECF No. 43-2 at 120–21.)

During deliberations, the jury requested to rehear testimony from Dr. Schwartz-Watts and Dr. Narayan regarding Wood's mental state, and the court obliged.  (App. at 2235–39, ECF No. 43-3 at 6–10.)  After the jury resumed deliberations, Mr. Mauldin stated for the record his position that Wood's Anderson County counsel's consent to the Department of Mental Health evaluation without considering a possible impact on his Greenville County trial was *per se* ineffective assistance of counsel and directly resulted in the admission of Dr. Narayan's testimony.  (App. at 2251, ECF No. 43-3 at 22.)

In his PCR application, Wood asserted his trial counsel were ineffective for failing to:  (1) object to the testimony from medical providers of the South Carolina Department of Mental health, (2) prevent access to Wood by the South Carolina Department of Mental Health, and (3) expose the incorrect diagnosis of the medical providers from the South Carolina Department of Mental Health. (App. at 3640–41, ECF No. 45-2 at 99–100.)

To support these claims, PCR counsel called the four Department of Mental Health employees who examined Wood, including Dr. Narayan, and questioned them almost exclusively regarding the antisocial personality disorder diagnosis and whether it was supported by evidence of

misconduct before the age of fifteen. (See App. at 3134–64, 3196–3255, ECF No. 44-5 at 31–61, ECF No. 44-5 at 93–44-6 at 18.)

In addition, PCR counsel presented testimony from two other psychiatrists—Dr. Thomas Cobb and Dr. Schwartz-Watts. Dr. Cobb testified he had been treating Wood through the South Carolina Department of Corrections since the end of 2002 or beginning of 2003 (App. at 2713, ECF No. 44-1 at 50) and that during his time with the Department of Corrections Wood had been diagnosed with antisocial personality disorder, bipolar disorder, psychotic affective disorder, mood disorder not otherwise specified, substance dependence, intermittent explosive disorder, and substance induced psychosis (App. at 2720, ECF No. 44-1 at 57). He stated that, other than antisocial personality disorder, all of Wood's conditions were treatable and that Wood had been responding to medication. (App. at 2721, 2727, ECF No. 44-1 at 58, 64.) However, Dr. Cobb noted the only treatment for antisocial personality disorder was incarceration. (App. at 2721, ECF No. 44-1 at 58.)

On cross-examination, Dr. Cobb noted a person's mental state is fluid and could be impacted by extended incarceration. (App. at 2733–35, ECF No. 44-1 at 70–72.) He also agreed that the Department of Corrections medical records contained multiple entries by different members of the treatment team diagnosing Wood with antisocial personality disorder. (App. at 2742–45, ECF No. 44-1 at 79–82.)

Dr. Schwartz-Watts explained why she disagreed with Dr. Narayan's diagnosis of antisocial personality disorder. (App. at 2830–34, ECF No. 44-2 at 15–19.) She reported that she and Mr. Mauldin had difficulty getting Wood to cooperate and that Wood admitted to faking symptoms of mental illness during his evaluations at the Department of Mental Health. (App. at 2845–46, ECF

PJG

No. 44-2 at 30–31.) Wood was not very forthcoming, he did not have many friends or family members to provide information, and the defense team was unable to locate records from his childhood. Accordingly, Dr. Schwartz-Watts had a difficult time conducting her mental health evaluation. (See App. at 2858, ECF No. 44-2 at 43.)

Mr. Mauldin explained that he and Wood had a serious disagreement about whether Wood should submit to a state evaluation. (App. at 3069, ECF No. 44-4 at 92.) He testified that Wood was already being evaluated by the defense team's private psychiatrist in preparation for the Greenville County trial and he did not want anything in the Anderson County case to "damage" the Greenville County case. (App. at 3068, ECF No. 44-4 at 91.) While it may have been "awkward" to argue against his client's position (App. at 3091, ECF No. 44-4 at 114), because Mr. Mauldin did not believe Wood was incompetent, he viewed the evaluation as merely a means for the State to slip in anti-mitigation evidence.

Mr. Bannister testified that he and Mr. Mauldin felt that nothing good could come out of a Department of Mental Health evaluation and strongly advised Wood on multiple occasions not to participate. (App. at 3312–13, ECF No. 44-6 at 75–76.) Once the evaluation was done, counsel knew that calling Dr. Schwartz-Watts could open the door to Dr. Narayan's testimony and the Department of Mental Health report. (App. at 3314, ECF No. 44-6 at 77.) But, given the dearth of mitigating evidence in the case, they decided they had to take the risk and present Dr. Schwartz-Watts. (App. at 3314–14, ECF No. 44-6 at 77–78.)

Based on this evidence, the PCR court found trial counsel were not ineffective for failing to object to Dr. Narayan's testimony, failing to prevent Wood from undergoing a Department of Mental

Health evaluation, or failing to impeach Dr. Narayan's antisocial personality disorder diagnosis. (See App. at 3667–701, ECF No. 45-3 at 14–48.)

In contrast to his original PCR claims, Wood now argues trial counsel were ineffective for failing to present evidence from a pretrial neuropsychological evaluation that revealed indicators of brain damage, including:

> (1) a statistically significant split between verbal and non-verbal IQ; (2) visual perceptual deficits; (3) increased brain power in certain areas coexisting with decreased brain power in other areas in a pattern consistent with dementia; and, (4) excessive numbers of coherence abnormalities, which is a condition often seen in cases of brain damage where, to help compensate for brain damage, brain function has come to involve mass action rather than more normal, differentiated action.

(Pet., ECF No. 85 at 24.) Neither Wood nor Respondents cite to the location of this report in the record nor has Wood provided it to the court. Further, this allegation is only mentioned in the Petition and in Wood's reply regarding the status of Ground Six (ECF No. 186), and is not briefed or argued by either party. Therefore, the court finds that Wood has abandoned this claim. Moreover, even if Wood has not abandoned this portion of Ground Six, he has not shown that this claim is substantial under Martinez and, therefore, cannot overcome the procedural default. Accordingly, the court recommends granting summary judgment on Ground Six.

### 5.     Ground Seven

In Ground Seven, Wood asserts that his trial counsel's opening argument at the penalty phase, combined with the State's closing argument and preprinted verdict forms shifted the burden to the defense to overcome a seemingly presumptive death sentence. Thus, Wood alleges that his trial counsel was ineffective in making his opening statement and in failing to object to the State's closing argument (See Ground Five) and to the verdict forms. Ground Seven was raised only in the

second PCR proceeding and is, therefore, exhausted but defaulted. Wood relies on <u>Martinez</u> to overcome the default, arguing that his first set of PCR counsel were ineffective in failing to raise this claim.

Just as the conduct of prosecutors is circumscribed, defense counsel is subject to the same "duty to confine arguments to the jury within proper bounds." <u>Young</u>, 470 U.S. at 9. Thus, defense counsel may not make "improper insinuations and assertions calculated to mislead the jury," <u>Berger</u>, 295 U.S. at 85, or "use arguments calculated to inflame the passions or prejudices of the jury," <u>Darden</u>, 477 U.S. at 192. However, improper comments only impinge the Constitution if, in the context of the whole record, they have denied the defendant a fair trial. <u>See</u> <u>Donnelly</u>, 416 U.S. at 643 (indicating that solicitor's improper remarks only violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process"); <u>Lighty</u>, 616 F.3d at 359 (recognizing that prosecutor's argument must be both improper and so prejudicial as to deny a defendant a fair trial); <u>Bennett</u>, 842 F.3d at 323 ("Courts must conduct a fact-specific inquiry and examine the challenged comments in the context of the whole record.").

In addition, to show that his underlying claim of ineffective assistance of trial counsel has merit, Wood must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that, "under the circumstances, the challenged action might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689. Wood must further show there is a reasonable probability that the jury would not have concluded that the balance of aggravating and mitigating circumstances warranted death absent counsel's alleged errors. <u>Id.</u> at 695–96.

In his opening statement in the penalty phase, Mr. Mauldin told the jury:

On Monday, when you filed into this courtroom with your verdict and the verdict was passed to the clerk and read by the clerk, I watched you, and I saw the sadness in your faces, and I saw the anger in your faces, and I knew that that sorrow was for Eric Nicholson and for Misty Nicholson and that anger was for John Wood.

I know that you believe that John Wood deserves to die for what you convicted him of. I know that you believe that just the crime itself, the nature of the crime itself, is just enough. I know that somehow the imposition of execution feels right today.

And I guess you may feel shocked to hear me, of all people, actually saying that. But quite frankly I think that needs to be said. You are only halfway through this ordeal, this journey, this responsibility. And I don't know that - - the second half is not going to be as long in time as the first half, but I think it's going to be a whole lot longer in significance to you. But I also believe that you actually want do to [sic] what's right. I think you actually want to do what's right, otherwise you wouldn't have subjected yourself to this ordeal.

I believe that in order to go forward and do what is right you've got to acknowledge your own feelings, and that's why I make these comments. You know, we need to kind of strip away some of the façade and some of the covering and actually face some of these facts. There is no reason to assume you have some false sense of impartiality, I mean after what you've heard. It doesn't really make good sense to me. You are angry and you are outraged, and we understand that. You know, when jurors come into the courtroom, they're supposed to be somehow some kind of controlled, stoic, tough - - but the fact is that jurors are human beings just like everybody else.

And now we're going to ask you to go even farther. We're going to ask you to consider between life and death for a man whose acts you despise and at the same time try to be calm and collected about it.

Well, my message to you this morning is that it's okay to be human about it . . . .

You can believe these feelings that I've commented to you and still keep on listening. Keep on listening. Don't stop listening.

. . . And if you keep listening in spite of these feelings that I really believe you have and you had, even though it's perhaps impossible to imagine what could justify not executing John Wood, I would hope that you would find a reason to choose life - - even for John Wood.



And it is this reason for life that we will bring to you, this message that we hope you will honestly, fairly, individually consider. For one thing, it's your sworn duty to. But, you know, that's the easy way out. I'm doing this because it's my sworn duty is not really what I want to say to you. I want to say that because it's a life, not because you're sworn that you have to but because it's a life, and any life is worth considering.

Your task, your journey is not over until each of you individually, honestly, fairly and morally consider both the death penalty and life in prison without parole.

. . . .

We will demonstrate to you that by your verdict two critical things have been accomplished. The first thing that's been accomplished is that the society is in fact protected. Society is in fact protected. And the second critical point is that John Wood is in fact harshly punished.

Are these reasons to consider a life sentence in a life or death situation? Is extermination the only answer? Well, while death is an answer, I hope that you will see in the next day or two that it's not the only answer. And it is the answer of life which we will bring to you, the alternative of life in prison without parole.

So while I stand before you and acknowledge your feelings that you must have, I tell you that while death might feel right today, I hope that death will not necessarily feel so right tomorrow.

(App. at 1850–53, 1859, ECF No. 42-7 at 90-93, 99.)

According to Wood, "[b]y unequivocally presenting life as the sentence for which he hoped, but which he did not anticipate, and death as the obvious course of action, Mr. Mauldin improperly took on the burden of proof as to the proper sentence and treated death as the presumptive verdict" and, thus, "inflamed [the jury's] passions and prejudices in a way that acquiesced to and even facilitated the jurors' bias against a life sentence." (Traverse, ECF No. 150 at 40.) The State contends that Mr. Mauldin's statements were clearly a strategic effort to humanize himself, gain credibility, and "more effectively persuade the jurors to consider a life sentence by acknowledging their feelings of anger and resentment toward Wood." (Return, ECF No. 137 at 98, 100.)



The court finds that Wood has not met his burden of showing that Mr. Mauldin's opening statements to the jury were not a reasonable trial tactic. Further, even if Mr. Mauldin's statements were improper, any error does not rise to a constitutional level because, in the context of the whole sentencing proceeding, Wood cannot show that he did not receive a fair trial or demonstrate a reasonable probability that the jury would not have recommended death absent counsel's alleged errors.

As the Supreme Court has recognized, "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court." Boyde v. California, 494 U.S. 370, 384 (1990). "This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." Id. at 384–85. Here, during the sentencing proceeding, the jury received accurate instruction from the trial court on the applicable burden of proof twice. First, at the opening of the penalty phase, the court informed the jury:

> So our purpose in conducting this proceeding, in which we are now engaged, is to determine whether the defendant, John Richard Wood, should be sentenced by the court to death or to life imprisonment. With respect to your particular role in this proceeding you will be asked to determine first whether the State has proved an aggravating circumstance beyond a reasonable doubt. In this case the State asserts under state law one aggravating circumstance.

> The alleged circumstance of aggravation which South Carolina law recognizes as a circumstance of aggravation is as follows: the murder of a federal, state or local law enforcement officer, peace officer or former peace officer, corrections employee or former corrections employee, or fireman or former fireman during or because of the performance of his official duties.

> Ladies and gentlemen, the State has the burden of proving that circumstance of aggravation beyond a reasonable doubt. Any determination as to the presence of the



alleged circumstances of aggravation must be unanimous. If you do not find that the State has proved the aggravating circumstance beyond a reasonable doubt, you will inform the court at that stage in your deliberations, and at that point your job will be complete. This is so because a finding of an aggravating circumstance unanimously and beyond a reasonable doubt is necessary before you can even consider death as a possible punishment or life imprisonment as a possible punishment.

(App. at 1843–44, ECF No. 42-7 at 83–84.) And, during the jury charges at the end of the penalty phase, the court repeatedly referenced and described the State's burden. (See, e.g., App. at 2219, 2220, 2221, ECF No. 43-2 at 116 ("Moreover, a sentence of death must be based on proof, in your judgment and assessment, beyond a reasonable doubt."), 117 ("Ladies and gentlemen, in arriving at your decision you must first determine from the evidence presented during the trial and during this sentencing proceeding whether the alleged statutory aggravating circumstance existed beyond a reasonable doubt at the time the victim, Eric Nicholson, was murdered by John Richard Wood."), 118 ("Before you can impose a death sentence on defendant, all twelve of you must agree and find beyond a reasonable doubt that the evidence in this case establishes that a statutory aggravating circumstance exists. Unless you so find, you cannot sentence the defendant to death . . . .")).

Further, in his penalty phase opening statement, the solicitor reiterated the trial judge's instructions. After describing aggravating circumstances in general and the particular one the State relied on in this case, the solicitor told the jury:

Ladies and gentlemen, I submit to you that after hearing all the evidence and if you find that Eric Nicholson - - if you find beyond a reasonable doubt that Eric Nicholson was a law enforcement officer and was acting in his official duties at the time of his murder, that is when you can consider the death penalty, and only then can you consider the death penalty or any penalty.

(App. at 1849, ECF No. 42-7 at 89.)

And, any lingering doubt about the burden of proof was quelled by trial counsel's closing, which directly addressed the State's burden in overcoming the presumption of life:

> I believe, and I believe what you'll hear this judge tell you is that the sentencing phase is an individualized assessment of what the proper penalty is for the person who has been convicted. In other words, it is supposed to be crafted for the individual defendant. That's what the law says anyway. That's why we've had this hearing. If it wasn't that way, if it really wasn't that way, then the killing of a law enforcement officer would be an automatic - - the penalty would be death, if what he is saying is the law. But that ain't the law. That's not the way the law works, and he knows it.
>
> The death penalty is never required. I talked to you about that at jury selection. I remind you of that now. You need to have respect for each other's views. I submit, in fact, that there is somewhat an inference to the very contrary of what the government is now telling you, and that is a presumption of life. I want you to - - don't listen to me, and don't listen to him. But listen to the judge when he tells you what the law is.
>
> Two points to that inference that I've mentioned. Two things he'll say will tell you exactly what I'm saying. He's not going to say there is a presumption of life like he did a presumption of innocence in the first trial. But two and two equal four. And, listen. Number one, the government must prove the appropriateness of the death penalty beyond a reasonable doubt. There is your presumption of a life sentence. The burden is on the government to prove beyond a reasonable doubt that the death penalty is the appropriate punishment. So I answer his bell ringing argument.
>
> The second thing that points out the presumption of life is that all twelve have to sign if you impose the death penalty. When we leave here, all twelve of you would have signed the death penalty or the sentence will be life in prison. I mean, that's the way the law works.

(App. at 2199–201, ECF No. 43-2 at 96–98.) Given all of the information the jurors received throughout the sentencing proceeding, it is unlikely any portion of Mr. Mauldin's opening statement misled them regarding the applicable burden of proof.

Wood argues that he was further prejudiced by the verdict forms the jury received at his trial. Before retiring to deliberate, the jury was given four forms: (1) Unanimous Recommendation of

Sentence for Death Penalty, (2) Unanimous Finding of an Aggravating Circumstance, (3) Unanimous Recommendation of Sentence for Life Imprisonment, and (4) No Finding of Aggravating Circumstance. (Attach. A to Traverse, ECF No. 150-1.) The first two of these forms included a line for each juror to sign with his or her name printed beneath it, should he or she agree to the recommendation or finding on that form. According to Wood, "[i]ncluding the juror's names on the form carried with it the unmistakable impression that the judge believed that the death penalty was the correct punishment and expected the jury to recommend a sentence of death" and trial counsel was, therefore, ineffective in failing to object to the forms. (Pet., ECF No. 85 at 28.)

Respondents counter that trial counsel were not deficient nor was there resulting prejudice because the verdict forms directly follow the applicable statutory language and include an accurate statement of the State's burden of proof. (Reply, ECF No. 154 at 10–11.) The court agrees.

South Carolina Code section 16-3-20(C) states, in relevant part:

The jury, if its verdict is a recommendation of death, shall designate in writing, and signed by all members of the jury, the statutory aggravating circumstance or circumstances which it found beyond a reasonable doubt. The jury, if it does not recommend death, after finding a statutory aggravating circumstance or circumstances beyond a reasonable doubt, shall designate in writing, and signed by all members of the jury, the statutory aggravating circumstance or circumstances it found beyond a reasonable doubt.

...

If the jury has found a statutory aggravating circumstance or circumstances beyond a reasonable doubt, the jury shall designate this finding, in writing, signed by all the members of the jury. The jury shall not recommend the death penalty if the vote for such penalty is not unanimous as provided.

S.C. Code Ann. § 16-3-20(C). Thus, if applicable, each member of the jury must sign the form finding an aggravating circumstance. And, a recommendation of death must be unanimous. The

verdict forms comply with these statutory directives. Further, the statute does not proscribe the inclusion of signature lines for each juror on the verdict form recommending the death penalty.

Moreover, Wood has failed to show that the verdict forms, or counsel's alleged error in not objecting to them, resulted in any prejudice. Contrary to Wood's contention, the trial judge reiterated the State's burden and expressly told the jury that he was not endorsing or advocating any position when he described the forms during his jury charge:

> Now let's look at the next document. And this next document is entitled "No Finding of Aggravating Circumstance." If the jury is unable to conclude beyond a reasonable doubt the existence of the alleged aggravating circumstance, then, Madame Forelady, you would sign this particular form, date it and that would end your deliberations.

> Now let's look at the next one. And we're going to review each of these. And in reviewing each of them, please don't construe that I am saying one applies or one doesn't apply. I'm just reviewing them all so you'll know the total charge and the total options available to you.

> Okay. The next one is the finding of the aggravating circumstance. It says, "We, the jury, find beyond a reasonable doubt the following aggravating circumstance." You write in the circumstance, if you find it exists beyond a reasonable doubt, and each juror then signs where indicated and it is dated.

> All right. Let's go to the next one. Now, the next one is the unanimous recommendation of sentence for life imprisonment. "Having found beyond a reasonable doubt the existence of the following statutory aggravating circumstance," again, write it out, and this says, "recommend to the court the defendant be sentenced to life." If this is ultimately your decision and all twelve agree, then, Madame Forelady, you would sign where indicated and date it with the appropriate date.

> Now let's look at the last one. This is the unanimous recommendation for sentence of sentence for death penalty. Again, the same lead in, "Having found the aggravating circumstance," and it must be listed, "now recommend to the court the defendant be sentenced to death." Again, a signature line for all twelve who are deliberating and then a place for the date.

> Regardless of the sentence you decide to impose you must first determine whether the State has proven beyond a reasonable doubt the alleged statutory aggravating circumstance. Any decision you make must be unanimous.
>
> In summary, you may impose the death penalty only if you unanimously find beyond a reasonable doubt the existence of the alleged statutory aggravating circumstance and you further unanimously find and agree beyond a reasonable doubt that the sentence should be death.

(App. at 2226–28, ECF No. 43-2 at 123–125.) In addition, as noted in the above quoted section, the forms themselves contain the correct standard of proof. (See ECF No. 150-1 at 1 ("We, the jury, having found beyond a reasonable doubt the existence of the following statutory aggravating circumstance . . ."), 2 ("We, the jury, find beyond a reasonable doubt the following statutory aggravating circumstance . . .")).

Thus, considering the entire sentencing proceeding, including the solicitor's closing argument (discussed in Ground Five), Wood has failed to show that any of counsel's alleged errors in this ground resulted in an unreliable sentence. Rather, it is clear from the record that the jury received thorough and accurate instruction on the State's burden of proof throughout the penalty phase, and the court has no reason to doubt that it applied that standard in determining Wood's sentence. Accordingly, Wood has failed to demonstrate that the underlying ineffective assistance of counsel claim for this ground has some merit, and Wood cannot rely on Martinez to overcome the procedural default. The court, therefore, recommends granting summary judgment on Ground Seven.

6. **Ground Ten**

Wood presents Ground Ten as a freestanding <u>Brady</u>[26] and <u>Napue</u>[27] claim based on the State's alleged suppression of a SLED investigation into the plausibility of Ms. McCall's claims that Wood controlled the accelerator and back window switch throughout the Anderson County pursuit, and the resulting presentation of false testimony.

It is undisputed that Ms. McCall was not present when Wood shot Officer Nicholson. She did, however, pick up Wood in her Jeep Grand Cherokee Wagoneer after the shooting and drive him on a high-speed chase through Anderson County. During the chase, Wood shot at the pursuing officers and, when the police shot out the Wagoneer's tires, Wood commandeered a utility truck at gun-point, which he drove until he was shot by the police. The State indicted Ms. McCall for her part in the crimes and, at the time of Wood's trial, she was confined in the Anderson County Detention Center awaiting her trial. Ms. McCall's testimony offers background on her relationship with Wood; reveals that she owned the gun, the motorcycle, and the car involved; and contains a detailed account of her recollection of the events leading up to and after Wood shot Officer Nicholson. (<u>See</u> App. at 1423–99, ECF No. 42-4 at 56–132.)

At issue in Ground Ten is Ms. McCall's testimony at Wood's Greenville County trial that Wood forced her to drive the Wagoneer. Specifically, Ms. McCall testified that Wood "reached over [her] with his foot and stomped [her] foot on the gas pedal," and reached over her and pushed the button to roll down the back window so he could shoot at the pursuing officers. (App. at 1441–43,

---

[26] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[27] <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).

ECF No. 42-4 at 74–76.)  Ms. McCall also indicated that Wood "snatched the steering wheel several times."  (App. at 1445, ECF No. 42-4 at 78.)

At the Anderson County trial, a SLED agent testified that he and another agent had investigated Ms. McCall's Jeep to assess whether "it was possible to . . . commandeer the vehicle from the passenger seat" and "if you could control the driving, control the gas, control the brakes." (See Attach. B to Traverse, ECF No. 150-2 at 4.)  The SLED agents concluded that it was not possible to reach the accelerator from the passenger side due to the configuration of the car and that to reach the rear window switch, a person would have to lie across the dashboard and the steering wheel. (ECF No. 150-2 at 4, 6–8, 10.)  That SLED investigation took place on December 15, 2000, well before Wood's Greenville County trial. (ECF No. 150-2 at 11.)

This claim was raised only in Wood's second PCR action and is admittedly defaulted.  (See Pet., ECF No. 85 at 36.)  To overcome the default, Wood appears to rely on Martinez.  (See ECF No. 85 at 37; ECF No. 150 at 49 ("Petitioner's trial counsel and PCR counsel failed to raise this claim before the state courts, and it is therefore procedurally defaulted.")).  However, the ineffective assistance of PCR counsel cannot serve as cause to overcome the procedural default of this freestanding claim.

In Martinez, the Supreme Court stressed that its decision was one based on equitable considerations rather than any constitutional right to the effective assistance of collateral counsel. Martinez, 566 U.S. at 16.  Accordingly, to appropriately balance the equitable considerations discussed in Martinez with the "important interests served by state procedural rules at every stage of the judicial process and the harm to the States that results when federal courts ignore these rules" recognized in Coleman, 501 U.S. at 749, the Court narrowly defined the circumstances in which

Martinez applies. The Court expressly declined to "extend [its holding] to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." Martinez, 566 U.S. at 16. And since the Martinez decision, the Court has declined to extend Martinez to claims other than those alleging ineffective assistance of trial counsel. See Davila v. Davis, 137 S. Ct. 2058, 2065 (2017) ("Petitioner asks us to extend Martinez to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim. We decline to do so."). Accordingly, Martinez is inapplicable to Wood's freestanding claims based on Brady or Napue.

Absent the Martinez exception, to show cause Wood must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). In the context of a Brady claim, if the State concealed material information and "that concealment, rather than tactical considerations, was the reason for the failure of petitioner's lawyers to" raise the claim in a timely manner, then petitioner has established cause to excuse the procedural default. Strickler v. Greene, 527 U.S. 263, 288 (1999).

While Wood did not raise this exact claim in his PCR application, he did raise a claim of ineffective assistance of trial counsel for failure to adequately impeach Ms. McCall. In responding to questions about that claim at the PCR evidentiary hearing, Mr. Mauldin made clear his opinion that impeaching Ms. McCall would not have improved Wood's case. Mr. Mauldin recognized discrepancies in Ms. McCall's testimony:

I believe pretty much her testimony was - - was generally self-serving about acts that she - - the things that she did and the things that he did. In fact, I believe she said he stepped over with his foot and pressed on the gas and that really - - that did not - - I did not feel, as the person responsible for her cross-examination, that was something that really needed to be dealt with in great detail. It was a person who was involved in a very serious offense and was trying to make the jury think that she did not have much to do with it. And whether or not they believed her really was not the point, as far as I was concerned.

(App. at 2875, ECF No. 44-2 at 60.) But, his strategy was "not to necessarily trash Karen McCall unless she had gotten on the witness stand and formulated some story that was completely inconsistent with her written statement, or we had evidence that she was just blatantly lying to the jury." (App. at 3057, ECF No. 44-4 at 80.) And Mr. Mauldin did not think that Ms. McCall's testimony rose to that level. (App. at 3057–58, ECF No. 44-4 at 80–81 ("[I]t did not rise to that level. It was, you know, she gave - - indicated, I guess you could best describe it, some of the details, but the fact of the matter is that was not - - we did not believe that that would be a beneficial approach to - - to defending John Wood in what happened out off Woodruff Road.").)

The record does not indicate whether trial counsel knew of or possessed the SLED report at issue in this claim. However, trial counsel were clearly aware of the Anderson County proceedings and made a calculated decision to limit the evidence admitted from that case and to attempt to lessen the impact of any evidence that made it in front of the jury. (See App. at 2892, ECF No. 44-2 at 77 ("I don't recall exactly how much of the Anderson County information came out during the trial in Greenville. We were attempting to limit that as much as we could."); App. at 3258, ECF No. 44-6 at 21 ("Well, the strategy on what happened in Anderson was primarily, let's get it out in the guilt phase so that we can let the jury hear [sic] it would be very unlikely that all these witnesses will be called back for the sentencing phase.")). And, when specifically asked if he could have called

Anderson County law enforcement officers to testify regarding discrepancies in Ms. McCall's account, Mr. Mauldin responded:

> We could have called law enforcement officers as witnesses in our case if we had felt like the distinction regarding what they were saying Ms. McCall did and what she was saying she did would benefit our client.
>
> . . . .
>
> I did not think that calling law enforcement officers to ask them whether they had seen inside that Jeep was really going to help John Wood in his Greenville County capital case involving Eric Nicholson. That's all I recall. I can say there was - - it would have been great risk. It - - there would have been a great risk in my opinion calling a law enforcement officer to testify for John Wood in this case.
>
> . . . .
>
> [F]rom an approach point of view, or from a theory point of view, I simply did not, one, believe that that was consistent impeaching her and trying to show every different little line and lie - - -
>
> . . . .
>
> . . . was really going to wind up - - was that the rewards for doing that were in our view outweighed by the damages that we could do to ourselves.

(App. at 2889–90, ECF No. 44-2 at 74–75.) Wood has failed to show that these tactical considerations would not have applied equally to the SLED investigation report regarding Ms. McCall's Jeep.

In addition, the record suggests that Ms. McCall was one of the few people assisting in trial counsel's mitigation investigation and information from interviews with Ms. McCall factored heavily into Mr. Youngman's and Dr. Schwartz-Watts's penalty phase presentations. (See, e.g., App. at 2067, 2079, 2084, ECF No. 43-1 at 90, 102, 107; App. at 1978, 1983, 1988–89, ECF No. 42-8 at 84, 89, 94–95.) Thus, impeaching Ms. McCall during the guilt phase would not have

PJG

served Wood well in the penalty phase—likely a weighty consideration in a case where the question of guilt or innocence was subordinate to efforts to avoid the death penalty.

Moreover, Wood has not shown that he was prejudiced by the State's alleged withholding of this information or presentation of Ms. McCall's testimony. To establish prejudice for his Brady claim, Wood must show that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289; see also Kyles v. Whitley, 514 U.S. 419, 433–44 (1995). Here, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence," or whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434–35. Similarly, under Napue, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue, 360 U.S. at 271)).

According to Wood, "[I]t is more than reasonably probable that had the jury believed Ms. McCall was more culpable or that petitioner was not so 'mean' as to put the 'innocent' mother of his child into harm's way, it would have chosen a penalty other than death." (Traverse, ECF No. 150 at 48.) However, impeaching Ms. McCall's limited testimony about Wood forcing her to drive would not have significantly altered the weight of the aggravating evidence that Wood shot and killed Officer Nicholson, the relevant statutory aggravating circumstance; during the subsequent chase, Wood shot at the pursuing police officers, injuring one of them; and, Wood car-jacked a truck

PJG

at gunpoint.[28]  Thus, as the PCR court found, "[W]hether [Ms. McCall] was more of a participant in the subsequent Anderson County pursuit does nothing to reduce [Wood's] legal or moral guilt for killing the trooper," the key issue in Wood's Greenville County trial.  (App. at 3649, ECF No. 45-2 at 108.)  Accordingly, Wood has failed to show that, given all of the other aggravating evidence, had trial counsel possessed information tending to impeach this small portion of Ms.  McCall's testimony and chosen to use it during trial, there is a reasonable probability or a reasonable likelihood the jury would not have sentenced Wood to death.[29]  Thus, Wood has failed to show cause and prejudice to excuse his default of this ground.

Wood requests authorization to conduct discovery on this ground for the purpose of proving facts to establish cause and prejudice to excuse the procedural default.  (See Traverse, ECF No. 150 at 49.)  Specifically, Wood seeks "any documents, correspondence, or communication regarding any experiments or other analysis related to McCall's Jeep, McCall herself, her account of the events of the crime, preparation of McCall's testimony at petitioner's trial, or any other issue related to

---

[28] Further, as Respondents note, the SLED agent's testimony at the Anderson County trial does not directly contradict Ms. McCall's Greenville County testimony.  (See Reply, ECF No. 154 at 13.)  At trial, Ms. McCall testified that Wood straddled the console and faced backwards to shoot at the officers.  (App. at 1442–43, ECF No. 42-4 at 75–76.)  On cross-examination at the Anderson County trial, Agent Donohue testified that the agents never attempted a reconstruction from that position.  (Attach. B to Traverse, ECF No. 150-2 at 17–18.)

[29] In addition, while Ms. McCall's testimony may have added to the State's case, it did not make it.  Wood's guilt or innocence did not depend on the jury finding Ms. McCall credible and her credibility played no part in finding the statutory aggravating circumstance on which the jury based its sentence.  See United States v. Bagley, 473 U.S. 667, 690–91 (1985) ("The failure to disclose evidence affecting the overall credibility of witnesses corrupts the process to some degree in all instances, but when 'the reliability of a given witness may well be determinative of guilt or innocence,' and when 'the Government's case depend[s] almost entirely on' the testimony of a certain witness, evidence of that witness' possible bias simply may not be said to be irrelevant, or its omission harmless.") (quoting Giglio, 405 U.S. at 154).



McCall's credibility." (ECF No. 150 at 49.)  Respondents addressed this request in their response to Wood's motion for an evidentiary hearing, asserting that Wood is not entitled to discovery because he has failed to show cause and prejudice for this ground.  (See Resp. to Mot. for Evid. Hr'g, ECF No. 153 at 7.)  The court agrees.

Rule 6 of the Rules Governing Section 2254 cases in the United States District Courts allows a judge, "for good cause," to "authorize a party to conduct discovery under the Federal Rules of Civil Procedure."  Good cause exists "when 'specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" Wolfe v. Johnson, 565 F.3d 140, 165 n.3 (4th Cir. 2009) (quoting Bracy v. Gramley, 520 U.S. 899, 908-09 (1997)).

Wood's specific allegations suggest that information existed that could have been used to impeach one portion of Ms. McCall's testimony and reduce her credibility.  However, as discussed above, even taking all of Wood's allegations as true, he fails to show cause and prejudice to excuse the default or that his claims, if proven, may entitle him to relief.  The additional evidentiary support Wood requests would not change this result.  Accordingly, Wood has not shown good cause and the court denies his discovery request.

E.    **Petitioner's Motion for an Evidentiary Hearing**

Wood has moved for an evidentiary hearing and an opportunity to expand the record pursuant to Rules 7 and 8 of the Rules Governing Section 2254 Cases and Martinez, to show that he can overcome his procedural default of Grounds Four, Five, Seven, and Ten.[30]  (Mot. for Evid. Hr'g,

---

[30] As noted in the beginning of the court's discussion of Grounds Four and Five, Ground Four, independently, is not properly before this court for habeas review.  Thus, while Ground Four is entwined with Ground Five, any evidentiary hearing or further factual development would actually relate to Ground Five.  Thus, the court omits Ground Four from its discussion of this motion.



ECF No. 151; Reply in Supp. of Mot. for Evid. Hr'g, ECF No. 160 at 1.)  Respondents oppose

Wood's motion and argue that <u>Martinez</u> does not mandate an opportunity for additional fact finding

and that Wood has failed to show his <u>Martinez</u> grounds have some merit.  (<u>See</u> Resp. to Pet.'s Mot.

for Evid. Hr'g, ECF No. 153.)

　　The "AEDPA generally prohibits federal habeas courts from granting evidentiary hearings

when applicants have failed to develop the factual bases for their claims in state courts." <u>Schriro v.</u>

<u>Landrigan</u>, 550 U.S. 465, 473 n.1 (2007) (citing 28 U.S.C. § 2254(e)(2)).  However, there are

circumstances in habeas matters in which expanding the record and granting an evidentiary hearing

are appropriate.  As this court and others have recognized, a court may exercise its discretion to

expand the record when considering whether cause and prejudice excuse a petitioner's defaulted

claim.  <u>Fielder</u>, 2013 WL 593657, at *3 (citing <u>Cristin v. Brennan</u>, 281 F.3d 404, 416 (3d Cir.

2002)).  Thus, where a petitioner relies on <u>Martinez</u> to show cause and prejudice, a court may find

additional evidentiary development necessary to adequately consider whether PCR counsel were

deficient and whether prejudice resulted from the errors.  However, depending on the state court

record and the claim raised by the petitioner, it may not be necessary for a court to expand the record

because it may be clear that the petitioner cannot succeed in all elements of his <u>Martinez</u> claim.

　　Here, based on the record, the court has found that the underlying ineffective assistance of

counsel claims for Grounds Five and Seven are not substantial.  Because these claims lack merit,

Wood is not entitled to further factual development.  As Wood appears to admit, the only additional

relevant information for these record-based claims would be evidence of trial and PCR counsel's

strategy.  (<u>See</u> ECF No. 150 at 29, 45 ("To the extent there are issues of disputed material facts

regarding this claim that this Court must resolve (such as whether PCR counsel had any strategic

reasons for failing to raise these claims and/or whether trial counsel had any strategic reasons for failing to object at trial) petitioner requests an evidentiary hearing and moves for expansion of the record for the purpose of proving facts to establish cause and prejudice to excuse his procedural default.")).  However, even if Wood presented evidence that counsel's strategic decisions were entirely unreasonable, or that counsel did not have a strategic reason for his action or inaction, Wood has still failed to show any resulting prejudice.  Thus, Wood has failed to allege facts that, if proven, would entitle him to relief.  See Schriro, 550 U.S. at 474 ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.")

The burden is on the petitioner to show, in his federal filings, that his defaulted claims have some merit.  For this purpose and in accordance with Martinez, Juniper,[31] and Gray,[32] this court appoints highly qualified, independent counsel and routinely allots time and resources for their investigation and development of potential Martinez claims.  In this case, Wood's counsel filed his petition, including the Martinez grounds, approximately nine months after commencing the federal action.  (See Initial Mots., ECF Nos. 1, 2 (filed Dec. 7, 2012); Order Appointing Counsel, ECF No. 16 (filed Dec. 18, 2012); Pet., ECF No. 85 (filed Sept. 19, 2013).)  Along with the petition, Wood filed a motion to stay his federal proceedings so he could pursue the unexhausted Martinez claims

---

[31] Juniper v. Davis, 737 F.3d 288 (4th Cir. 2013) (finding petitioner entitled to independent counsel to investigate potential ineffective assistance of state counsel claims).

[32] Gray v. Pearson, 526 F. App'x. 331 (4th Cir. 2013) (finding petitioner entitled to independent counsel where, in order to identify potential Martinez claims, counsel would be required in federal habeas proceeding to argue his own ineffectiveness in his representation of petitioner in state post-conviction proceedings).

in state court.  (Mot. to Stay, ECF No. 86.)  The court granted Wood's motion and this action remained stayed for almost four years.  (See Order Granting Mot. to Stay, ECF No. 93 (filed Oct. 23, 2013); Order Lifting Stay, ECF No. 126 (filed Aug. 29, 2017, effective Oct. 2, 2017).)  During that time, Wood briefed and argued these claims, along with state court procedural issues.  (See Status Reports, ECF Nos. 100, 104, 110; Add'l Attachs. to Cnty. Ct. R., ECF Nos. 134–35.)  In addition, after this matter was unstayed and fully briefed, the court delayed its decision to allow Wood to complete an ongoing investigation.  Counsel have had ample opportunity to develop these grounds.

Wood argues that "because factual development is necessary to prove ineffective assistance of counsel, Martinez, would be a 'dead letter' without expansion of the record."  (ECF No. 160 at 3.)  The court agrees that expansion of the record is sometimes appropriate, or even necessary, to properly evaluate cause and prejudice of defaulted claims.  But, only when a petitioner shows that those claims are substantial.  If extra-record evidence is needed, a petitioner may show substantiality through attachments to his petition.  See, e.g., Owens v. Stirling, 0:16-cv-02512, Am. Pet., ECF No. 117, Add'l Attachs., ECF Nos. 163, 176 (attaching twenty-one documents to the Amended Petition, including affidavits regarding ineffective assistance of counsel claims, and adding evidentiary support to the Amended Petition after the court lifted the stay).  The court can then evaluate those attachments under Rule 7 of the Rules Governing Section 2254 Cases and decide if the petitioner has met his burden and if expansion of the record or an evidentiary hearing are warranted.

Here, Wood has not included any evidentiary support, leaving the court with only the record and unsupported allegations.  This is not enough to show that Wood may be able to overcome the

PJG

default with further factual development. Accordingly, the court denies Wood's motion to expand

the record and for an evidentiary hearing as to Ground Five and Ground Seven.[33]

As to Wood's freestanding <u>Brady</u> and <u>Napue</u> claims in Ground Ten, the court grants Wood's

request to expand the record to the limited extent that it has considered Agent Donohue's testimony.

However, having found that Wood has failed to show the materiality of the contested report and

testimony, the court denies Wood's motion to further expand the record for Ground Ten.

## ORDER AND RECOMMENDATION

The court GRANTS Wood's motion to enlarge the record with respect to Agent Donohue's

testimony, but DENIES his motion for an evidentiary hearing and to enlarge the record on Grounds

---

[33] The court notes that its reasoning here is in line with the Fifth Circuit's recent decisions. In <u>Segundo v. Davis</u>, 831 F.3d 345 (5th Cir. 2016), the Fifth Circuit found that the district court did not abuse its discretion in declining to hold an evidentiary hearing where the petitioner failed to make either showing required under <u>Martinez</u>. The Fifth Circuit reasoned that "<u>Martinez</u> and <u>Trevino</u> protect[] habeas petitioners from completely forfeiting an [ineffective assistance of counsel] claim; neither entitles petitioners to an evidentiary hearing in federal court in order to develop such a claim." <u>Id.</u> at 351. "Reading <u>Martinez</u> to create an affirmative right to an evidentiary hearing would effectively guarantee a hearing for every petitioner who raises an unexhausted [ineffective assistance of counsel] claim and argues that <u>Martinez</u> applies." <u>Id.</u> Thus, to grant an evidentiary hearing, "there 'must be a viable constitutional claim, not a meritless one, and not simply a search for evidence that is supplemental to evidence already presented.'" <u>Id.</u> (quoting <u>Ayestas v. Stephens</u>, 817 F.3d 888, 896 (5th Cir. 2016) (per curiam), vacated on other grounds by <u>Ayestas v. Davis</u>, 138 S.Ct. 1080 (2018)). As Wood notes, for the claim at issue in <u>Segundo</u>, the district court had the benefit of a fairly developed record. Thus, Wood asserts that his case is more akin to <u>Washington v. Davis</u>, 2017 WL 6523437 (5th Cir. Dec. 20, 2017), where the Fifth Circuit vacated the district court's denial of an evidentiary hearing where there had never been a state hearing on the issue and the petitioner had not had a reasonable opportunity to discover the information before filing his federal petition. However, here, Wood's claims are entirely record-based, unlike Segundo's intellectual disability and Washington's insufficient mitigation investigation claims, which clearly required extra-record evidence. Further, in <u>Washington</u>, the district court did not evaluate the record and did not find that there was sufficient evidence in the record to deny Washington's claim. <u>Id.</u> at *5. And, the Fifth Circuit found that Washington's ineffective assistance of counsel claims were at least debatable. <u>Id.</u> In this case, the court has conducted a thorough review of the record and found that the evidence in the record sufficiently demonstrates that Wood's ineffective assistance of counsel claims lack merit.



Four, Five, Seven, and Ten. Further, the court DENIES Wood's motion for discovery on Ground

Ten. In addition, for the reasons stated herein, the court recommends granting Respondents' motion

for summary judgment (ECF No. 136) and dismissing Wood's petition (ECF No. 85).

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

October 1, 2018
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).